# EXHIBIT 1

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

**THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into and is effective as of February 14, 2017 (the "**Effective Date**"), by and between Gemma Turi, an individual ("**Seller**"), and Red Dragon Partners, LLC a Florida limited liability company ("**Buyer**").

### RECITALS

A.    Seller is a founding member ("**Member**") of TruthMD, LLC, a Delaware limited liability company, doing business as "MedFax" (the "**Company**").

B.    Buyer has expressed an interest in purchasing a Membership Interest ("**Membership Interest**") in the Company. The Company has recently completed an equity raise and has no immediate plans to offer or sell additional Membership Interests.

C.    Seller has agreed to make one (1) Series B Unit of Membership Interest in the Company (the "**Unit**") available for purchase by Buyer upon the terms and conditions and subject to the limitations set forth herein.

**NOW, THEREFORE**, in consideration of the mutual representations, warranties, covenants, and agreements of the parties hereinafter set forth, the parties hereto agree as follows:

### ARTICLE I
### PURCHASE AND SALE OF THE UNIT

**1.1.    Purchase and Sale.**    Upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase, accept, and acquire from Seller, and Seller agrees to sell, transfer, assign, convey, and deliver to Buyer, at the Closing (as hereinafter defined), the Unit for the Purchase Price.

**1.2.    Purchase Price.**    In consideration of the sale of the Unit, Buyer shall pay to Seller in cash the sum of                                               (the "**Purchase Price**"). The Purchase Price shall be payable to Seller in cash at the Closing.

### ARTICLE II
### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows:

**2.1.    Power and Authority.**    Seller has the power and authority to execute, deliver, and perform this Agreement and the other agreements and instruments to be executed and delivered by Seller in connection with the transactions contemplated hereby and thereby, if any. This Agreement has been duly executed and delivered by Seller and Seller will, on or prior to the Closing Date, duly execute and deliver the documents referred to herein to which it is to be a

party.  Assuming the due authorization, execution and delivery of this Agreement and the documents referred to herein by the parties hereto and thereto other than Seller, this Agreement constitutes, and when executed and delivered each of such documents referred to herein will constitute the legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and general equitable principles. No consents, approvals or authorizations are required other than consents, approvals or authorizations that have been obtained.

      **2.2.**   **Title to the Common Unit.**  Seller is the owner, beneficially and of record, of the Common Unit and has and will transfer to Buyer at the Closing, good and indefeasible title to the Unit, free and clear of all title defects, liens, restrictions, pledges, hypothecations, claims, charges, security interests, or other encumbrances of any nature whatsoever.

      **2.3.**   **Broker's or Finder's Fees.**  Seller has not authorized any person to act as broker or finder or in any other similar capacity in connection with the transactions contemplated by this Agreement and no broker, finder or financial advisor is entitled to any broker's, finder's, or financial advisor's fee or other commission in respect thereof based in any way on any agreement, arrangement or understanding with Seller.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

      **3.1.**   **Power and Authority.**  Buyer has the power and authority to execute, deliver, and perform this Agreement and the other agreements and instruments to be executed and delivered by him in connection with the transactions contemplated hereby and thereby, and Buyer has taken all necessary action to authorize the execution and delivery of this Agreement and such other agreements and instruments and the consummation of the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by Buyer and Buyer will, on or prior to the Closing Date, duly execute and deliver the documents referred to herein to which he is to be a party.  Assuming the due authorization, execution and delivery of this Agreement and the documents referred to herein by the parties hereto and thereto other than Buyer, this Agreement constitutes, and when executed and delivered each of such documents referred to herein will constitute the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with their terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and general equitable principles.

      **3.2.**   **Broker's or Finder's Fees.**  Buyer has not authorized any person to act as broker, finder, or in any other similar capacity in connection with the transactions contemplated by this Agreement and no broker, finder or financial advisor is entitled to any broker's, finder's, or financial advisor's fee or other commission in respect thereof based in any way on any agreement, arrangement or understanding with Buyer.

    

**3.3.** **Investment Representations.** Buyer understands that neither this Agreement, nor the Unit has been registered under the 1933 Act. Buyer also understands that the Unit is being offered and sold pursuant to an exemption from registration contained in the 1933 Act based in part upon the Buyers' respective representations contained in this Agreement. Buyer hereby further represents and warrants as follows:

(a) *Buyer Can Bear Economic Risk.* Buyer has substantial experience in evaluating and investing in private placement transactions of securities in companies similar to the Company so that Buyer is capable of evaluating the merits and risks of his investment in the Company and has the capacity to protect its own interests. Buyer understands the risks of an investment in the Company and can afford to bear such risks, including without limitation, the risk of losing such Buyer's entire investment. Buyer is capable of bearing the economic risk of this investment indefinitely unless the Unit is registered pursuant to the Securities Act and applicable state securities laws, or an exemption from registration is available. Buyer acknowledges that no market for the Unit currently exists and none is expected to develop in the future and, as a result, it may be difficult, if not impossible, to liquidate such Buyer's investment at a time when such Buyer finds it desirable to do so.

(b) *Acquisition for Own Account.* Buyer is acquiring the Unit for such Buyer's own account for investment only, and not with a view towards their distribution.

(c) *Buyer Can Protect His Interest.* Buyer represents that by reason of his business or financial experience, such Buyer has the capacity to protect its own interests in connection with the transactions contemplated in this Agreement and the Unit.

(d) *Accredited Investor.* Buyer represents that he is an "accredited investor" within the meaning of Regulation D under the Securities Act.

(e) *Company Information.* Buyer has received and read the Limited Liability Company Agreement of the Company, and has had an opportunity to discuss the Company's business, management and financial affairs with officers and the Managers of the Company and has had the opportunity to review the Company's operations.

(f) *Rule 144.* Buyer represents that he is familiar with the nature of the restrictions imposed by the Securities Act and the rules and regulations thereunder on the transfer of securities. Buyer acknowledges and agrees that the Unit may not be sold, assigned or transferred unless it is subsequently registered under the 1933 Act and applicable state securities laws, or an exemption from such registration is available. Buyer has been advised or is aware of the provisions of Rule 144 promulgated under the 1933 Act as in effect from time to time, which permits limited re-sales of securities purchased in a private placement subject to the satisfaction of certain conditions, including, among other things: the availability of certain current public information about the Company, the resale occurring following the required holding period under Rule 144 and the number of securities being sold during any three-month period not exceeding specified limitations.

261878.2                                                              2959.000

(g) *Transfer Restrictions; Legends.* Buyer acknowledges and agrees that the Unit is subject to restrictions on transfer. It is understood that the Certificate for the Unit when issued shall bear a legend substantially in the following form (in addition to any legend required under applicable state securities laws):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR QUALIFIED UNDER ANY STATE SECURITIES LAWS, AS APPLICABLE (THE "LAWS"). THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT ONLY AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE TRANSFERRED UNLESS THEY HAVE BEEN REGISTERED UNDER THE ACT AND QUALIFIED UNDER THE LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY HAS BEEN RECEIVED THAT REGISTRATION UNDER THE ACT AND QUALIFICATION UNDER THE LAWS ARE NOT REQUIRED.

TRANSFER OF THESE SECURITIES IS SUBJECT TO THE RESTRICTIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT FOR THE COMPANY, AS AMENDED. THE COMPANY WILL FURNISH WITHOUT CHARGE TO EACH UNIT HOLDER WHO SO REQUESTS, A COPY OF THE LIMITED LIABILITY COMPANY AGREEMENT, WHICH SETS FORTH THE POWERS, DESIGNATIONS, PREFERENCES AND RELATIVE RIGHTS OF UNIT HOLDERS AND THE QUALIFICATIONS, LIMITATIONS OR RESTRICTIONS OF SUCH RIGHTS.

## ARTICLE IV
## CLOSING

**4.1.    The Closing.** The closing of the purchase and sale of the Unit (the "**Closing**") shall take place at the offices of the Company at such other place and time as the parties shall agree (the "**Closing Date**").

**4.2.    Seller Deliveries.** At Closing, Seller shall deliver, or cause to be delivered, the following documents to Buyer, in each case duly executed or otherwise in proper form:

(a) *Certificate for the Unit.* If certificated, a certificate representing the Unit, together with a duly executed assignment.

(b) *Other Documents.* All other documents, instruments or writings required to be delivered to Buyer at or prior to Closing pursuant to this Agreement, if any.

**4.3.    Buyer Deliveries.** At Closing, Buyer shall deliver the following documents to the Seller, in each case duly executed or otherwise in proper form:

(a) *Cash Closing Payment.* A certified or bank cashier's check or wire transfer, in the amount required by Section 1.2 hereof.

4

(b) *Other Documents.* All other documents, instruments or writings required to be delivered to Seller at or prior to Closing pursuant to this Agreement, if any.

**4.4.    Further Assurances.** At and after the Closing, without further consideration, each of the parties hereto shall take all such other action and shall procure or execute, acknowledge, and deliver all such further certificates, conveyance instruments, assumption instruments, consents, and other documents as the other party or its counsel may reasonably request: (i) to vest in Buyer, and perfect and protect Buyer's right, title, and interest in, and enjoyment of, the Unit; or (ii) to ensure more effectively the compliance of such party with its agreements and covenants under this Agreement and the other documents referred to herein.

## ARTICLE V
## MISCELLANEOUS

**5.1.    Limited Liability Company Agreement.** Upon the execution of this Agreement, Buyer shall, automatically and with no further action of the Company or Buyer, be (i) entitled to receive Distributions and allocations of Net Income and Net Loss from the Company attributable to the Unit acquired from Seller and shall be treated as the absolute owner thereof in all respect and (ii) subject to all of the terms, conditions and restrictions of the Limited Liability Company Agreement as if Buyer had executed such document directly. Buyer agrees to execute such documents, acknowledgments, certificates, or other documents (including, without limitation, the Limited Liability Company Agreement and any agreements thereto) as the Company may reasonably request in order to evidence Buyer's membership interest in the Company.

**5.2.    Entire Agreement; Amendment.** This Agreement, the documents referred to herein, and the other certificates, agreements, and other instruments to be executed and delivered by the parties in connection with the transactions contemplated hereby, constitute all of the promises, agreements, conditions, understandings, warranties and representations between the parties hereto with respect to the transactions contemplated hereby and thereby, and supersede all prior agreements, arrangements and understandings between the parties hereto, whether written, oral or otherwise. There are no promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, between the parties hereto concerning the subject matter hereof or thereof except as set forth herein and therein. No amendment, modification, or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by the parties hereto.

**5.3.    Parties Bound by Agreement; Successors and Assigns.** The terms, conditions, and obligations of this Agreement shall inure to the benefit of and be binding upon the parties hereto and the respective successors and permitted assigns thereof. Without the prior written consent of the other party, neither party hereto may assign or transfer all or any portion of its rights, duties and obligations hereunder and any attempt to do so without such consent shall be null and void; provided, however, that no assignment by either of the parties hereto of any of its rights, membership interests or obligations hereunder shall relieve such party of its obligations under this Agreement.

**5.4.    Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same Agreement.

**5.5.    Headings.**  The headings of the Sections and paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof.

**5.6.    Waiver.**  No waiver of any provision of this Agreement shall be valid unless in writing and signed by the party against whom that waiver is sought to be enforced.  No failure or delay on the part of either of the parties hereto in exercising any right, power or privilege hereunder, and no course of dealing between the parties hereto, shall operate as a waiver of any right, power or privilege hereunder.

**5.7.    Expenses.**  Neither Seller nor Buyer shall pay any of the other's costs and expenses incurred by him or it or on his or its behalf in connection with this Agreement and the transactions contemplated hereby, including fees and expenses of its own financial consultants, accountants, and counsel.  It is understood that each party hereto is solely responsible for his or its own costs and expenses and to the extent desired, has consulted with its own legal counsel.

**5.8.    Notices.**  Any notice, request, instruction, or other communication to be given hereunder by any party hereto to any other party hereto shall be in writing and delivered personally or sent by facsimile, overnight commercial courier or registered or certified mail, postage prepaid:

> If to Seller to:          Gemma Turi

> If to Buyer to:          Red Dragon Partners, LLC
>                          Attn: Shailesh Gupta

or at such other address for a party as shall be specified by like notice.  Notices shall be deemed given upon the earliest of:  (i) receipt; (ii) confirmed facsimile transmission; (iii) one (1) day after delivery to an overnight commercial courier; or (iv) three (3) days after deposit in U.S. mail.

**5.9.    Governing Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of California.

**5.10.    Severability.**  Should any clause, sentence, paragraph, subsection, Section or Article of this Agreement be judicially declared to be invalid, unenforceable or void, such decision will not have the effect of invalidating or voiding the remainder of this Agreement, and

the parties hereto agree that the part or parts of this Agreement so held to be invalid, unenforceable or void will be deemed to have been stricken and ineffective as if such stricken part or parts had never been included herein.

**5.11. Remedies.** All rights and remedies under this Agreement are cumulative and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity including, without limitation, injunctive relief and specific performance and not one of them shall be exclusive of any other.

**5.12. Attorneys' Fees.** In the event of any proceeding arising out of or related to this Agreement, the prevailing party shall be entitled to recover from the losing party all of its costs and expenses incurred in connection with such proceeding, including court costs and reasonable attorneys' fees, whether or not such proceeding is prosecuted to judgment.

**5.13. Interpretation.** In this Agreement, unless a clear contrary intention appears:

(a) The words "hereof", "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(b) Reference to any gender includes each other gender and the neuter;

(c) All terms defined in the singular shall have the same meanings in the plural and vice versa;

(d) The word "person" means any individual, firm, corporation, trust, association, company, limited liability company, joint stock company, partnership, joint venture, Governmental Authority or other entity or enterprise;

(e) Reference to any person includes such person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (e) is intended to authorize any assignment not otherwise permitted by this Agreement;

(f) Reference to a person in a particular capacity or capacities excludes such person in any other capacity;

(g) Reference to any contract or agreement means such contract or agreement as amended, supplemented or modified from time to time in accordance with the terms thereof;

(h) All references to Articles, Sections, and Exhibits shall be deemed to be references to the Articles and Sections of this Agreement and the Exhibits attached hereto which are made a part hereof and incorporated herein by reference;

(i) The word "including" (and with correlative meaning "include") means including, without limiting the generality of any description preceding such term;

7

(j) With respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding";

(k) Reference to any Law means such Law as amended, modified, codified, reenacted, supplemented or superseded in whole or in part, and in effect from time to time;

(l) The word "knowledge", when used in any representation, covenant or warranty of either of the parties hereto contained herein, means the actual knowledge of any officer, director or member of senior management of, or other person performing similar functions for, such party;

(m) Where any provision of this Agreement refers to action to be taken by any person, or which such person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such person; and

(n) No provision of this Agreement shall be interpreted or construed against either of the parties hereto solely because that party or its legal representative drafted such provision.

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Membership Interest Purchase Agreement as of the date first above written.

"BUYER"

Red Dragon Partners **LLC**

By: _____
Shailesh Gupta, Managing Member

8

261878.2                                                                 2959.000

"SELLER"

Gemma Turi

REVIEWED AND APPROVED:

"COMPANY"

**TruthMD, LLC**, a Delaware limited
liability company

By: _____
Gemma Cunningham, Chief Executive Officer

# EXHIBIT 2

**To:** Shailesh[Personal/Financial Information]
**From:** Gemma Cunningham[gemma.cunningham@truthmd.com]
**Sent on behalf of:** Gemma Cunningham <gemma.cunningham@truthmd.com>
**Sent:** Sun 10/11/2020 9:46:31 PM Coordinated Universal Time
**Subject:** Fourth Amended & Restated TruthMD LLC Agreement
**Attachment:** SECOND Amended and Restated TruthMD LLC Agreement (5-1-14).pdf
**Attachment:** REDLINE - Comparison between Second and Fourth Amended and Restated TruthMD LLC Agreement.pdf

Hi Shailesh,

You first invested in 2017 at which time the 2014 Second Amended & Restated Operating Agreement was in effect, which is attached - along with a redline showing the cumulative changes made from the Second A&R LLCA to the Fourth A&R LLCA (and notes below from our counsel, Curt Barwick.)

*The changes made from the Second to the Third A&R LLCA were ministerial and clean up related to (i) adding definitions and references with respect to additional Series of Preferred Units that had been authorized and issued (Series C through F), (ii) new IRS regulations changing Tax Matters Partner to Tax Representative and (iii) updating the Schedule of Members to December 31, 2019.*

*The most recent changes (from the Third to the Fourth A&R LLCA) are again ministerial and clean up with changes to the recitals and again to update the Schedule of Members from January 1, 2020 through September 17, 2020.*
Hope this helps  Let me know if you need anything additional!

Regards,
Gemma

> **From:** Shailesh Gupta < ███████████ >
> **Date:** October 8, 2020 at 3:03:52 PM PDT
> **To:** Gemma Cunningham <gemma.cunningham@truthmd.com>
> **Subject: Re:  Fourth Amended & Restated TruthMD LLC Agreement**
>
>
> Hi Gemma,
> I don't believe that I ever received the original operating agreement or any of the three original amendments.
> Please provide them for my review if you will.
>
> Thanks
>
>
>
> Best Regards Shailesh K Gupta
>
>
> On Thursday, October 8, 2020, 05:16:23 PM EDT, Gemma Cunningham <gemma.cunningham@truthmd.com> wrote:
>
>
>
> To TruthMD Members:
>
>
> Attached is TruthMD's Fourth Amended and Restated Limited Liability Company Agreement as approved by the TruthMD LLC Board of Managers on September 21, 2020. In addition to minor ministerial updates and changes, the primary reason for the amendment was to update Schedule 1, the "Schedule of Members", which follows page 35.
>
>
> Please carefully review Schedule 1 as it is the Company's legal record of each Member's capital contribution and Unit holdings.
>
> While the Company, shortly after its formation, did elect to issue Unit Certificates – this became administratively inconvenient as the number of Members and Units grew over time. It is not common for LLCs to issue certificates and the applicable Delaware law does not require such certificates. Accordingly, TruthMD LLC ceased issuing certificates and on September 21, 2020 the TruthMD Board resolved for administrative convenience to cancel all outstanding Unit certificates. It is important to note that this does not affect your ownership in any way, given that the Schedule of Members attached to the Limited Liability Company Agreement has always been the official record. To avoid confusion, we ask that any holders of these now invalid certificates please mark them as cancelled and email a "cancelled" copyback to me.
>
> In the meantime, if you have any questions, please do not hesitate to contact me.
>
> Best Regards,

REDDRAGON00000961

**Gemma Cunningham**
CEO/Founder
**Truth**MD | (949) 637-4296
gemma.cunningham@medfax.com

# EXHIBIT 3

EFiled: Dec 01 2020 04:08PM EST
Transaction ID 66148580
Case No. 2020-1004-SG

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SUNIL M. MALKANI, NICHOLAS MATARAGAS, and RED DRAGON PARTNERS, LLC, individually and derivatively on behalf of TRUTHMD, LLC, | ) ) ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 2020-1004-SG |
| GEMMA CUNNINGHAM a/k/a GEMMA TURI, CHARLES D. ROSEN, and GARY WILSON, | ) PUBLIC VERSION ) FILED ON DECEMBER 1, 2020 ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| TRUTHMD, LLC, a Delaware limited liability company, | ) ) |
| | ) |
| Nominal Defendant. | ) |

## VERIFIED DIRECT AND DERIVATIVE COMPLAINT

Plaintiffs Dr. Sunil M. Malkani, Dr. Nicholas Mataragas, and Red Dragon Partners, LLC, individually and derivatively on behalf of TruthMD, LLC, allege for this complaint, upon knowledge as to themselves and upon information and belief as to all other matters, as follows:

1

## **INTRODUCTION**

1.    Plaintiffs bring this action on their own behalf and derivatively on behalf of TruthMD, LLC, a Delaware limited liability company ("TruthMD" or the "Company"). At all relevant times, Plaintiffs were members of TruthMD.

2.    Plaintiffs seek damages, declaratory relief, and preliminary and permanent injunctive relief against Defendants Gemma Cunningham a/k/a Gemma Turi, Charles D. Rosen, and Gary Wilson. Cunningham, Rosen, and Wilson are managers of TruthMD.

3.    Upon information and belief, as managers of TruthMD, Defendants Cunningham, Rosen, and Wilson have actual and complete control over TruthMD and constitute a control group.

4.    Plaintiffs have repeatedly requested from TruthMD and Defendants information regarding any other managers, but those requests have been denied. Upon information and belief, to the extent there are any other managers, they are subservient and beholden to Cunningham and Rosen.

5.    While negotiating the sale of TruthMD to a portfolio company of a well-known private equity group, Defendants, in an effort to enrich themselves at the last minute, caused the Company to issue to themselves 180 contingent value right units (the "CVR Units") that participate in the proceeds of the sale in a manner equivalent to that of common units of TruthMD. This improperly and substantially

2

reduced the available sales proceeds for Plaintiffs and all other TruthMD unitholders.

6.    Plaintiffs therefore seek damages for Defendants' breaches of TruthMD's operating agreement and breaches of their fiduciary duties to TruthMD and its unitholders. Plaintiffs further seek declaratory and preliminary and permanent injunctive relief to (i) rescind or declare void the issuance of the CVR Units to Defendants and (ii) enjoin the sale of TruthMD. Plaintiffs also seek specific performance of Defendants' obligations to issue warrants that can be converted to units. Finally, Dr. Malkani seeks declaratory relief regarding his rights under a note, note purchase agreement, and warrants as well as damages for breach of contract.

## **FACTUAL BACKGROUND**

### **The Parties**

7.    Plaintiff Dr. Sunil M. Malkani is, and at all relevant times has been, a member of TruthMD.

8.    Plaintiff Nicholas Mataragas is, and at all relevant times has been, a member of TruthMD.

9.    Plaintiff Red Dragon Partners, LLC ("Red Dragon") is a Florida limited liability company that is, and at all relevant times has been, a member of TruthMD.

10.    Defendant Cunningham is, and at all relevant times has been, the chief executive officer and a managing member of TruthMD.

3

11.     Defendant Rosen is, and at all relevant times has been, a managing member of TruthMD. Additionally, Rosen is Cunningham's husband.

12.     Defendant Wilson is, and at all relevant times has been, the chairman and a managing member of TruthMD.

13.     Nominal defendant TruthMD is a Delaware limited liability company. TruthMD is governed by the Third Amended and Restated Limited Liability Company Agreement ("LLC Agreement"), a copy of which is attached as Exhibit A.

**Plaintiff Malkani Invests in TruthMD.**

14.     In 2016, Dr. Malkani purchased three units of TruthMD for approximately $500,000.00. Each Unit represented approximately 0.5% of TruthMD.

15.     Between 2017 and 2020, Dr. Malkani made a series of loans to TruthMD.

16.     In connection with these loans, TruthMD executed a March 10, 2020 Secured Convertible Consolidated Promissory Note (the "March 2020 Note") in favor of Dr. Malkani in the principal amount of $1,825,953.00, with interest accruing at a rate of 18% per annum. A true and accurate copy of the March 2020 Note is attached as Exhibit B.

17.    No payments have been made under the March 2020 Note and interest continues to accrue.

18.    Pursuant to the March 2020 Note, Dr. Malkani has the option to convert the outstanding principal and accrued interest into units at a price per unit of the lower of (a) $50,000,000 divided by TruthMD's "Fully Diluted Capitalization," or (b) the price per unit offered by TruthMD to any purchaser at any time.

19.    Also on March 10, 2020, Dr. Malkani and TruthMD entered into a Secured Convertible Consolidated Promissory Note Purchase Agreement (the "Purchase Agreement"). A true and accurate copy of the Purchase Agreement is attached as Exhibit C.

20.    Pursuant to the Purchase Agreement, TruthMD agreed, among other things, to issue warrants to Dr. Malkani to purchase up to 12 units at a price of $250,000 per Unit.

21.    In a March 13, 2020 email to Dr. Malkani, Cunningham confirmed that the Dr. Malkani would receive warrants for 12 units. A true and correct copy of this email is attached as Exhibit D.

22.    Despite its obligation to do so and despite Cunningham's representations, three of the twelve warrants have not been issued to Dr. Malkani.

23.    Pursuant to the Purchase Agreement, TruthMD may not undergo a change in control or management structure nor sell any material portion of its assets

5

outside the ordinary course of its business without Dr. Malkani's consent.

24.     Pursuant to the Purchase Agreement, Dr. Malkani has the right to inspect all books and records of TruthMD.

25.     The Purchase Agreement also contains a most-favored-nation provision. Under this provision, if TruthMD issues any subsequent indebtedness or instruments that are convertible, in whole or in part, into equity securities of the Company, it must provide Dr. Malkani written notice of the issuance and a copy of all documentation related to such convertible securities. Dr. Malkani is further given the option to amend or restate the March 2020 Note to include any terms he deems preferable that are in such subsequent convertible security.

26.     To induce Dr. Malkani to make the referenced loans and enter into the Purchase Agreement, Cunningham made misrepresentations regarding the capitalization of TruthMD, including with respect to the number of outstanding warrants and amount of outstanding debt that could be converted to units. In particular, Cunningham provided Dr. Malkani with a capitalization table that falsely represented the debt and convertible debt of TruthMD.

27.     In making the above-referenced loans and entering into the above-referenced transactions, Dr. Malkani relied on representations by Cunningham regarding the capitalization of TruthMD. Cunningham's representations were made to induce Dr. Malkani's significant investments in TruthMD.

28.    Assuming all of TruthMD's known outstanding convertible debt was converted and all outstanding options and warrants were exercised, there should be approximately 225 units outstanding. Of those 225 units, Dr. Malkani would own at least approximately 27 units, or approximately 12% of TruthMD.

**Plaintiff Mataragas Invests in TruthMD.**

29.    In 2016, Dr. Mataragas purchased one Unit of TruthMD.

30.    On June 7, 2017, TruthMD granted Dr. Mataragas a non-statutory option to purchase another Unit of TruthMD for a purchase price of $166,000.00. On July 7, 2017, Dr. Mataragas exercised this non-statutory option to purchase another Unit of TruthMD.

31.    In June 2017, Dr. Mataragas also made a loan to TruthMD.

32.    In connection with this loan, TruthMD executed a June 7, 2017 Unsecured Promissory Note in favor of Dr. Mataragas, in the principal amount of $334,000.00, with interest accruing at a rate of 10% per annum.

33.    On February 1, 2019, TruthMD issued Dr. Mataragas a warrant to purchase one Unit for $250,000.00.

34.    On May 21, 2019, Dr. Mataragas converted $250,000.00 of the principal amount of the Unsecured Promissory Note into one Unit of TruthMD. A true and accurate copy of the Conversion Agreement is attached as Exhibit E.

7

35.    On June 12, 2019, Dr. Mataragas and TruthMD agreed to an increase in the rate of interest, from 10% to 15%.

36.    Aside from three interest payments, no other payments have been made pursuant to the Unsecured Promissory Note and interest continues to accrue.

37.    On August 1, 2020, TruthMD issued Dr. Mataragas a warrant to purchase another Unit for $250,000.00.

38.    In late August 2020, Cunningham advised Dr. Mataragas that TruthMD was working on a transaction to sell the company.

39.    On August 30, 2020, Cunningham emailed Dr. Mataragas and stated that, in connection with the transaction, she was "making sure that all of our paperwork is in order and that our financial condition looks as good as possible during the due diligence process." She therefore asked Dr. Mataragas to sign an Amended and Restated Unsecured Promissory Note extending the maturity date of the note.

40.    Dr. Mataragas and TruthMD subsequently signed an Amended and Restated Unsecured Promissory Note dated July 31, 2020, a true and accurate copy of which is attached as Exhibit F.

## Plaintiff Red Dragon Invests in TruthMD.

41.    In February 2017, Red Dragon purchased one Unit of TruthMD for $200,000.00

8

42.    On May 23, 2019, TruthMD granted Red Dragon a non-statutory option to purchase one Unit of TruthMD for a purchase price of $250,000.00.

43.    On August 1, 2020, Dr. Mataragas assigned and transferred one of his units to Red Dragon.

44.    In September 2020, Cunningham induced Red Dragon to invest further in TruthMD. Specifically, she induced Red Dragon to purchase three additional units for $250,000 per Unit on September 15, 2020.

45.    To induce Red Dragon to purchase three additional units in September 2020, Cunningham made misrepresentations regarding the capitalization of TruthMD.

46.    Red Dragon made clear that it would only purchase these additional three units if they were being purchased from an existing member. Red Dragon told TruthMD and Cunningham that it did not want to purchase new units because it did not want to create additional dilution for itself or other unitholders.

47.    To induce Red Dragon to purchase these three additional units, Cunningham misrepresented to Red Dragon that the units were being purchased from someone else who needed to "cash out."

**TruthMD Agrees to an Acquisition.**

48.    In September 2020, TruthMD entered into a letter of intent agreement to have substantially all of its assets and business acquired by a portfolio company

9

of a well-known private equity group, for an enterprise value of $180 million (the "Acquisition").

49.    Dr. Malkani did not consent to the Acquisition, as is required under the Purchase Agreement.

### Defendants Improperly Issue Themselves 180 CVR Units.

50.    While negotiating the Acquisition, and on the eve of signing a letter of intent for the acquisition, Defendants improperly authorized the issuance of 180 CVR Units to themselves, almost doubling the number of units outstanding on a fully diluted basis and transferring a substantial percentage of the eventual sales proceeds to themselves.

51.    Defendants had no authority to issue such CVR Units.

52.    Defendants' improper issuance of CVR Units was done in bad faith and in breach of Defendants' fiduciary duties to TruthMD and its unitholders.

53.    Defendants' improper issuance of CVR Units improperly and substantially diluted the residual interest of Plaintiffs and all other unitholders.

54.    Defendants' improper issuance of CVR Units is blatant excessive compensation.

55.    Each of the Defendants were directly self-interested in the decision to issue CVR Units to themselves and engaged in deliberate conflicts of interest, self-dealing, and breaches of fiduciary duties.

56.    Furthermore, Defendants paid inadequate or no consideration for the issuance of the CVR Units.

57.    The issuance of the CVR Units had no legitimate business purpose and was done solely to enrich Defendants at the expense of Plaintiffs and other unitholders.

58.    By almost doubling the number of outstanding units, Defendants effectively halved the residual interest of all other unitholders in a substantial portion of the consideration to be paid in connection with the Acquisition. Defendants did this to enrich themselves by an extra potential $56 million.

59.    Defendant Cunningham admitted that that the issuance of CVR Units was a self-granted "Bonus" that she and the other Defendants "feel we deserve" for supposedly increasing the consideration the private equity group is paying to acquire TruthMD.

60.    As managers and officers of TruthMD, however, Defendants already had a fiduciary duty to TruthMD and its unitholders to negotiate the highest acquisition price, without lining their own pockets in the process.

61.    Indeed, the LLC Agreement provides that any compensation to managers "shall be approved by a majority of the *disinterested* Managers." Ex. A, LLC Agreement § 5.6 (emphasis added).

11

62.     After being questioned about this transaction, Defendants manufactured a "Manager's Certificate" dated October 14, 2020, which purports to belatedly certify a September 21 vote on the issuance of CVR Units to Defendants allegedly approved by a majority of disinterested managers.

63.     Defendants never advised Plaintiffs of such a purported vote or about the issuance of CVR Units until after the fact. And upon information and belief, no unitholders were given notice of any such vote.

64.     Despite repeated requests from Plaintiffs, TruthMD has refused to provide documentation identifying which *disinterested* managers approved or voted on the issuance of CVR Units. Upon information and belief, such documentation does not exist because a majority of disinterested managers did not give such approval.

65.     As Defendants were interested in the transaction and all received CVR Units, the issuance was invalid from the outset.

66.     Plaintiffs are not aware of any approvals by a compensation committee or a fairness opinion in connection with Defendants' issuance of CVR Units to themselves as a "bonus."

67.     On October 8, 2020, Cunningham first gave notice to the members of TruthMD that a Fourth Amended and Restated Limited Liability Agreement was purportedly approved by the board of managers on September 21, 2020.

12

68.    The Fourth Amended and Restated Limited Liability Agreement is a nullity because amendments to the LLC Agreement require, among other things, a majority vote of the members. *See* Ex. A, LLC Agreement § 6.14. No such vote ever took place.

69.    Despite Plaintiffs' requests, Defendants and TruthMD have refused to provide documents related to the Acquisition or even confirm the scheduled closing date.

70.    Despite Plaintiffs' requests, Defendants and TruthMD have also refused to provide documents identifying who voted to approve the issuance of the CVR Units.

## DERIVATIVE STANDING ALLEGATIONS

71.    Defendants are, upon information and belief, a majority of the managers of TruthMD, who purportedly authorized, and were the beneficiaries of, the wrongfully issued Units or CVRs. Thus, demand on the managing members to bring suit would have been futile. Defendants would not have agreed to commence suit on TruthMD's behalf against themselves.

72.    At all relevant times, Plaintiffs were, and still are, members of TruthMD.

## COUNT I

### BREACH OF LLC AGREEMENT

73.    Plaintiffs incorporate by reference each of the foregoing allegations.

74.    Defendants' issuance of the CVR Units violated several provisions of the LLC Agreement.

75.    Pursuant to section 5.2 of the LLC Agreement, no new units or incentive options may be authorized or issued "without the approval or vote of (a) a majority of the Managers, (b) a majority of the Preferred Managers **and** (c) for so long as the Series A Preferred Members have a Percentage Interest that equals or exceeds five percent (5%), at least one (1) of the Preferred Managers elected by the Series A Preferred Members." The issuance of the CVR Units violated section 5.2 of the LLC Agreement because it was not done with the approval or vote of all persons required to approve or vote on such a matter.

76.    Pursuant to section 5.6 of the LLC Agreement, any compensation to managers "shall be approved by a majority of the disinterested Managers." The issuance of the CVR Units violated section 5.6 of the LLC Agreement because Defendants were not disinterested managers.

77.    Pursuant to section 6.19 of the LLC Agreement, each member must be given notice of the issuance of any new units setting forth the price and terms of the proposed issuance, with each member having a right to purchase a pro rata share of

14

the units. The issuance of the CVR Units violated section 6.19 of the LLC Agreement because none of its procedures were followed and Plaintiffs' and the other unitholders' preemptive rights under section 6.19 were completely disregarded.

78.    Section 11.4 of the LLC Agreement provides: "The parties hereto recognize that irreparable injury will result from a breach of any provision of this Agreement, and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party which may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (a) restraining and enjoining any act which would constitute a breach or (b) compelling the performance of any obligation which, if not performed, would constitute a breach, all without the need to post a bond and in an expedited hearing."

79.    As a result of Defendants' breaches of the LLC Agreement, Plaintiffs will suffer damages and irreparable harm.

## COUNT II

### BREACH OF FIDUCIARY DUTY

80.    Plaintiffs incorporate by reference each of the foregoing allegations.

81.    As a managing member and as the CEO of TruthMD, Cunningham owes TruthMD fiduciary duties of loyalty and care.

82.    As a managing member of TruthMD, Cohen owes TruthMD fiduciary duties of loyalty and care.

83.    As a managing member and as the Chairman of TruthMD, Wilson owes TruthMD fiduciary duties of loyalty and care.

84.    Defendants breached their fiduciary duties by engaging in a transaction in which they had a material conflict of interest, by engaging in self-dealing, and by knowingly breaching the LLC Agreement.

85.    Defendants further breached their fiduciary duties because the issuance of CVR Units constitutes excessive and unfair compensation.

86.    As a result of Defendants' breaches of their fiduciary duties, Plaintiffs and TruthMD have suffered and continue to suffer damages and irreparable harm.

## COUNT III

## RESCISSION OF UNITS

87.    Plaintiffs incorporate by reference each of the foregoing allegations.

88.    The issuance of the CVR Units is void because it violated the LLC Agreement and because it was done in bad faith and in violation of Defendants' fiduciary duties.

16

## COUNT IV

## SPECIFIC PERFORMANCE

89.    Plaintiffs incorporate by reference each of the foregoing allegations.

90.    A valid contract exists between TruthMD and Dr. Malkani pursuant to which Dr. Malkani is entitled to warrants to purchase 12 units of TruthMD.

91.    TruthMD has issued Dr. Malkani warrants for only 9 units.

92.    Dr. Malkani has performed all of his obligations under the parties' agreement.

93.    The balance of equities is in favor of Dr. Malkani, who would not have entered into the Purchase Agreement for fewer than 12 warrants.

## COUNT V

## DECLARATORY JUDGMENT

94.    Plaintiffs incorporate by reference each of the foregoing allegations.

95.    An actual controversy regarding the validity of the March 2020 Note and the Purchase Agreement exists between TruthMD and Dr. Malkani.

96.    In particular, TruthMD and Dr. Malkani dispute the existence and validity of (a) the March 2020 Note and related obligations, (b) the conversion provisions of Paragraph 4 of the March 2020 Note (c), TruthMD's covenant in paragraph 4 of the March 2020 Note not to issue or authorize any form of limited liability company interests, including "profit interests," or other equity securities that are not denominated in the form of a "Unit";  and (d) the Purchase Agreement's

17

prohibition on TruthMD undergoing a change in control or management structure during the term of the March 2020 Note without Dr. Malkani's consent.

97.    This controversy involves the rights or other legal relations of Dr. Malkani, is a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim, is a controversy between parties whose interests are real and adverse, and is a controversy with issues that are ripe for judicial determination.

98.    TruthMD has executed the March 2020 Note and the Purchase Agreement and both parties have performed or substantially performed under these agreements, including Dr. Malkani loaning the stated amounts to TruthMD.

99.    Dr. Malkani seeks a judicial declaration that the terms of the March 2020 Note and the Purchase Agreement are valid and enforceable.

## COUNT VI
## DECLARATORY JUDGMENT

100.    Plaintiffs incorporate by reference each of the foregoing allegations.

101.    Paragraph 4 of the March 2020 Note grants Dr. Malkani the right to convert the debt to units at a purchase price that is "the lower of (a) $50,000,000 divided by the Company's then Fully Diluted Capitalization or (b) the price per limited liability company interest, Unit or equity security on a Fully diluted Basis offered to by the Company to any purchaser at any time during which this

18

Consolidated Note may be optionally converted into equity of the Company."

102.   To the extent the Court finds the issuance of the CVR Units to Defendants to be valid, Dr. Malkani seeks a declaration that the above-quoted conversion provision of the March 2020 Note must take into account the CVR Units issued to Defendants in determining the price per unit if Dr. Malkani exercises his conversion rights.

103.   To the extent the Court finds the issuance of the CVR Units to Defendants to be valid, Dr. Malkani also seeks a declaration equitably adjusting the strike price on the warrants issued to him.

104.   The strike price agreed to in the warrants issued to Dr. Malkani was based on TruthMD's and Cunningham's representations that the capitalization of TruthMD would not be diluted.

105.   The strike price in the warrants should be equitably adjusted to account for the dilution caused by the issuance of the CVR Units to Defendants.

106.   This controversy involves the rights or other legal relations of Dr. Malkani, is a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim, is a controversy between parties whose interests are real and adverse, and is a controversy with issues that are ripe for judicial determination.

19

## COUNT VII

## DECLARATORY JUDGMENT

107.    Plaintiffs incorporate by reference each of the foregoing allegations.

108.    The Fourth Amended and Restated Limited Liability Agreement was never voted on or approved by a majority of unitholders.

109.    An actual controversy regarding the validity of the Fourth Amended and Restated Limited Liability Agreement exists between Plaintiffs and Defendants.

110.    This controversy involves the rights or other legal relations of Plaintiffs and Defendants, is a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim, is a controversy between parties whose interests are real and adverse, and is a controversy with issues that are ripe for judicial determination.

111.    Plaintiffs seek a declaration that the Fourth Amended and Restated Limited Liability Agreement is void.

## COUNT VIII

## BREACH OF CONTRACT

112.    Plaintiffs incorporate by reference each of the foregoing allegations.

113.    Paragraph 4 of the March 2020 Note prohibits TruthMD from issuing or authorizing any form of limited liability company interests, including "profit interests," or other equity securities that are not denominated in the form of a "Unit."

20

114.    TruthMD breached Paragraph 4 of the March 2020 Note by issuing the CVR Units to Defendants.

115.    As a direct and proximate result of this breach, Dr. Malkani has suffered damages in an amount to be proven at trial.

116.    The Purchase Agreement prohibits TruthMD undergoing a change in control or management structure during the term of the March 2020 Note without Dr. Malkani's consent.

117.    Dr. Malkani has not consented to the Acquisition and by proceeding with the Acquisition, the Defendants have caused TruthMD to breach the Purchase Agreement, by which breach Dr. Malkani will be irreparably harmed.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment:

(i)    Preliminarily and permanently enjoining the Acquisition from proceeding without Dr. Malkani's written consent and without complying with the applicable procedures in the LLC Agreement;

(ii)    Rescinding the issuance of the CVR Units or declaring the issuance of the CVR Units void;

(iii)    Holding  Defendants liable to Plaintiffs and TruthMD for damages for their breaches of the LLC Agreement;

(iv)    Holding Defendants liable to Plaintiffs and TruthMD for damages for their breaches of their fiduciary duties;

21

(v)     Holding Defendants liable to Dr. Malkani for damages for breach of the March 2020 Note;

(vi)    Ordering specific performance of TruthMD's obligation to issue Dr. Malkani three additional warrants;

(vii)   Declaring that the terms of the March 2020 Note and the Purchase Agreement are valid and enforceable;

(viii)  Declaring, in the alternative if the Court finds the issuance of the CVR Units to Defendants to be valid, that the price provision in Paragraph 4 of the March 2020 Note must take into account the CVR Units in determining the price per unit if Dr. Malkani exercises his conversion rights;

(ix)    Declaring the Fourth Amended and Restated Limited Liability Agreement to be a nullity;

(x)     Awarding Plaintiffs their reasonable attorneys' fees and costs;

(xi)    Awarding Plaintiffs pre- and post-judgment interest; and

(xii)   Granting such other relief as is just and proper.

ASHBY & GEDDES

OF COUNSEL

Marcos Daniel Jimenez
Marcos D. Jimenez, P.A.
255 Alhambra Circle – 8th Floor
Miami, Florida 33134
Tel: (305) 740-1975

Scott B. Cosgrove
Jeremy L. Kahn
LEÓN COSGROVE, LLP
255 Alhambra Circle – 8th Floor
Miami, Florida 33134
Tel: (305) 740-1975

Dated: November 20, 2020

*/s/ Philip Trainer, Jr.*
Philip Trainer, Jr. (#2788)
Marie M. Degnan (#5602)
Randall J. Teti (#6334)
500 Delaware Avenue
Wilmington, DE  19801
302-654-1888

*Attorneys for Plaintiffs*

23

# EXHIBIT 4

EFiled: Jul 06 2021 03:38PM EDT
Transaction ID 66742806
Case No. 2020-1004-SG

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SUNIL M. MALKANI, NICHOLAS )
MATARAGAS, and RED DRAGON )
PARTNERS, LLC, )
)
)
)
Plaintiffs, )
)
v. )
) C.A. No. 2020-1004-SG
GEMMA CUNNINGHAM a/k/a )
GEMMA TURI, CHARLES D. ROSEN, ) PUBLIC VERSION
GARY WILSON, and TruthMD, LLC, a ) FILED ON JULY 6, 2021
Delaware limited liability company, )
)
Defendants. )
)
)
)

## VERIFIED AMENDED COMPLAINT

Plaintiffs Dr. Sunil M. Malkani, Dr. Nicholas Mataragas, and Red Dragon

Partners, LLC, allege for this amended complaint, upon knowledge as to themselves

and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      At all relevant times, Plaintiffs were members of TruthMD, a Delaware

limited liability company ("TruthMD" or the "Company").

2.      Plaintiffs seek damages, declaratory relief, and preliminary and

permanent injunctive relief against Defendants TruthMD, Gemma Cunningham

a/k/a Gemma Turi, Charles D. Rosen, and Gary Wilson. Cunningham, Rosen, and Wilson (collectively, the "Manager Defendants") are managers and members of TruthMD.

3.     The Manager Defendants, together with managing member and TruthMD CFO Morgan St. John (together with the Manager Defendants, the "Controllers") constitute a majority of the Company's Board of Managers (the "Board").

4.     Upon information and belief, St. John is subservient and beholden to the Manager Defendants.

5.     While negotiating the sale of TruthMD to a portfolio company of a well-known private equity group, the Controllers, in an effort to enrich themselves, authorized the Company to issue to the Manager Defendants 180 contingent value right units (the "CVR Units") that would have participated in the proceeds of the sale in a manner equivalent to that of common units of TruthMD.

6.     When Plaintiffs and other unitholders objected to the self-interested dilution of their membership interests, the Controllers abandoned the CVR Units but have held fast to a transaction structure that preserves their unfair windfall upon the Company's sale.

7.     The Controllers have pre-authorized an excessive post-transaction earn-out to the Manager Defendants in the form of a membership distribution (the

"Manager Earn-out Distribution"), as well as a $3.66 million award of unearned "foregone salaries" that are payable to Cunningham and Rosen as soon as the sale is complete (the "Foregone Salary Payments"). The Manager Earn-out Distribution and Foregone Salary Payments both come directly out of the sale proceeds otherwise payable to Plaintiffs as unitholders of TruthMD.

8.     The Controllers have abused their authority to pre-approve the Manager Earn-out Distribution such that it becomes effective immediately upon closing of the sale of the Company. And, as Defendants have conceded, the completion of that sale is imminent.

9.     Like the aborted issuance of CVR Units before it, the Manager Earn-out Distribution improperly and substantially reduces the available sale proceeds for Plaintiffs and all other TruthMD unitholders.

10.     Plaintiffs therefore seek damages for Defendants' breaches of their fiduciary duties to Plaintiffs. Plaintiffs further seek declaratory and preliminary and permanent injunctive relief to (i) rescind or declare void the Manager Earn-out Distribution and (ii) enjoin the sale of TruthMD. Plaintiffs also seek specific performance of Defendants' obligations to issue warrants that can be converted to units. Finally, Dr. Malkani seeks declaratory relief regarding his rights under a note, note purchase agreement, and warrants as well as damages for breach of contract.

## FACTUAL BACKGROUND

### The Parties

11.     Plaintiff Dr. Sunil M. Malkani is, and at all relevant times has been, a member of TruthMD.

12.     Plaintiff Nicholas Mataragas is, and at all relevant times has been, a member of TruthMD.

13.     Plaintiff Red Dragon Partners, LLC ("Red Dragon") is a Florida limited liability company that is, and at all relevant times has been, a member of TruthMD.

14.     Defendant Cunningham is, and at all relevant times has been, the Chief Executive Officer and a managing member of TruthMD.

15.     Defendant Rosen is, and at all relevant times has been, a managing member of TruthMD.  He is also TruthMD's Medical Director.  Additionally, Rosen is Cunningham's husband.

16.     Defendant Wilson is, and at all relevant times has been, the Chairman and a managing member of TruthMD.

17.     Defendant TruthMD is a Delaware limited liability company. TruthMD is governed by the Third Amended and Restated Limited Liability Company Agreement ("LLC Agreement"), a copy of which is attached as Exhibit A.[1]

---

[1] The LLC Agreement was purportedly amended as the Fourth Amended and Restated Limited Liability Company Agreement (the "Amended LLC Agreement"), a copy of which is attached as Exhibit B.  Plaintiffs did not consent to the purported

4

18.    From at least September 21, 2020 to the present, the Board has consisted of seven managers: Cunningham, Rosen, Wilson, St. John, Steven Miller, Robert Stoltz, and Ben Chelovich.

### Plaintiff Malkani Invests in TruthMD.

19.    In 2016, Dr. Malkani purchased three units of TruthMD for approximately $500,000.00. Each Unit represented approximately 0.5% of TruthMD.

20.    Between 2017 and 2020, Dr. Malkani made a series of loans to TruthMD.

21.    In connection with these loans, in order to consolidate the then-outstanding principal and interest owed to Dr. Malkani by the Company into a single obligation, TruthMD executed a March 10, 2020 Secured Convertible Consolidated Promissory Note (the "March 2020 Note") in favor of Dr. Malkani in the principal amount of $1,825,953.00, with interest accruing at a rate of 18% per annum. A true and accurate copy of the March 2020 Note is attached as Exhibit C.

22.    No payments have been made under the March 2020 Note and interest continues to accrue.

---

amendment of the LLC Agreement.  Whether the Amended LLC Agreement was properly approved or is effective is of no moment, however, because the provisions of the Amended LLC Agreement relevant to Plaintiffs' claims are identical to those in the LLC Agreement.

23.     Pursuant to the March 2020 Note, Dr. Malkani has the option to convert the outstanding principal and accrued interest into units at a price per unit of the lower of (a) $50,000,000 divided by TruthMD's "Fully Diluted Capitalization," or (b) the price per unit offered by TruthMD to any purchaser at any time.

24.     On March 13, 2020, Dr. Malkani and TruthMD entered into a Secured Convertible Consolidated Promissory Note Purchase Agreement (the "Purchase Agreement"). A true and accurate copy of the Purchase Agreement is attached as Exhibit D.

25.     With respect to Dr. Malkani's obligations to the Company under the March 2020 Note and the Purchase Agreement, the only performance required of Dr. Malkani was that he provide an additional advance to TruthMD in the amount of $162,132.00 (the "New Advance").

26.     Dr. Malkani funded the New Advance on March 13, 2020 by wiring $162,132.00 to TruthMD's business account.

27.     Pursuant to the Purchase Agreement, TruthMD agreed, among other things, to issue warrants to Dr. Malkani to purchase up to 12 units at a price of $250,000 per Unit.

28.     In a March 13, 2020 email to Dr. Malkani, Cunningham confirmed that the Dr. Malkani would receive warrants for 12 units. A true and correct copy of this email is attached as Exhibit E.

29.    Despite its obligation to do so and despite Cunningham's representations, three of the twelve warrants have not been issued to Dr. Malkani.

30.    Pursuant to the Purchase Agreement, TruthMD may not undergo a change in control or management structure nor sell any material portion of its assets outside the ordinary course of its business without Dr. Malkani's consent.

31.    The Purchase Agreement also contains a most-favored-nation provision. Under this provision, if TruthMD issues any subsequent indebtedness or instruments that are convertible, in whole or in part, into equity securities of the Company, it must provide Dr. Malkani written notice of the issuance and a copy of all documentation related to such convertible securities. Dr. Malkani is further given the option to amend or restate the March 2020 Note to include any terms he deems preferable that are in such subsequent convertible security.

32.    Moreover, to induce Dr. Malkani to make the referenced loans and enter into the Purchase Agreement, Cunningham made misrepresentations regarding the capitalization of TruthMD, including with respect to the number of outstanding warrants and amount of outstanding debt that could be converted to units. In particular, Cunningham provided Dr. Malkani with a capitalization table that falsely represented the debt and convertible debt of TruthMD.

33.    In making the above-referenced loans and entering into the above-referenced transactions, Dr. Malkani relied on representations by Cunningham

regarding the capitalization of TruthMD. Cunningham's representations were made to induce Dr. Malkani's significant investments in TruthMD.

34.    On a preliminary injunction record, this Court has determined that it is more likely than not that the Purchase Agreement is enforceable by Dr. Malkani according to its terms.  Specifically, on April 21, 2021, the Court entered an order granting Plaintiffs' motion for preliminary injunction, memorializing the Court's rulings that: (i) Plaintiffs have demonstrated a likelihood of success on the merits of the claim that the Purchase Agreement is a valid contract, enforceable by Dr. Malkani according to its terms; (ii) pending final resolution of Dr. Malkani's claim for relief under the Purchase Agreement, TruthMD shall not undergo a change in control or management without having given counsel for the Plaintiffs no less than 60-days' advance notice in writing; and (iii) Dr. Malkani may seek prompt relief from this Court in connection with the imminent closing of any transaction that would effect a change in control or management of TruthMD.

35.    Assuming all of TruthMD's known outstanding convertible debt was converted and all outstanding options and warrants were exercised, there should be approximately 225 units outstanding. Of those 225 units, Dr. Malkani would own at least approximately 27 units, or approximately 12% of TruthMD.

## **Plaintiff Mataragas Invests in TruthMD.**

36.    In 2016, Dr. Mataragas purchased one Unit of TruthMD.

37.    On June 7, 2017, TruthMD granted Dr. Mataragas a non-statutory option to purchase another Unit of TruthMD for a purchase price of $166,000.00. On July 7, 2017, Dr. Mataragas exercised this non-statutory option to purchase another Unit of TruthMD.

38.    In June 2017, Dr. Mataragas also made a loan to TruthMD.

39.    In connection with this loan, TruthMD executed a June 7, 2017 Unsecured Promissory Note in favor of Dr. Mataragas, in the principal amount of $334,000.00, with interest accruing at a rate of 10% per annum.

40.    On February 1, 2019, TruthMD issued Dr. Mataragas a warrant to purchase one Unit for $250,000.00.

41.    On May 21, 2019, Dr. Mataragas converted $250,000.00 of the principal amount of the Unsecured Promissory Note into one Unit of TruthMD. A true and accurate copy of the Conversion Agreement is attached as Exhibit F.

42.    On June 12, 2019, Dr. Mataragas and TruthMD agreed to an increase in the rate of interest, from 10% to 15%.

43.    Aside from three interest payments, no other payments have been made pursuant to the Unsecured Promissory Note and interest continues to accrue.

44.    On August 1, 2020, TruthMD issued Dr. Mataragas a warrant to

purchase another Unit for $250,000.00.

45.    In late August 2020, Cunningham advised Dr. Mataragas that TruthMD was working on a transaction to sell the company.

46.    On August 30, 2020, Cunningham emailed Dr. Mataragas and stated that, in connection with the transaction, she was "making sure that all of our paperwork is in order and that our financial condition looks as good as possible during the due diligence process." She therefore asked Dr. Mataragas to sign an Amended and Restated Unsecured Promissory Note extending the maturity date of the note.

47.    Dr. Mataragas and TruthMD subsequently signed an Amended and Restated Unsecured Promissory Note dated July 31, 2020, a true and accurate copy of which is attached as Exhibit G.

**Plaintiff Red Dragon Invests in TruthMD.**

48.    In February 2017, Red Dragon purchased one Unit of TruthMD for $200,000.00

49.    On May 23, 2019, TruthMD granted Red Dragon a non-statutory option to purchase one Unit of TruthMD for a purchase price of $250,000.00

50.    On August 1, 2020, Dr. Mataragas assigned and transferred one of his units to Red Dragon.

51.    In September 2020, Cunningham induced Red Dragon to invest further

in TruthMD. Specifically, she induced Red Dragon to purchase three additional units for $250,000 per Unit on September 15, 2020.

52.    To induce Red Dragon to purchase three additional units in September 2020, Cunningham made misrepresentations regarding the capitalization of TruthMD.

53.    Red Dragon made clear that it would only purchase these additional three units if they were being purchased from an existing member. Red Dragon told TruthMD and Cunningham that it did not want to purchase new units because it did not want to create additional dilution for itself or other unitholders.

54.    To induce Red Dragon to purchase these three additional units, Cunningham misrepresented to Red Dragon that the units were being purchased from someone else who needed to "cash out."

**TruthMD Agrees to an Acquisition.**

55.    In September 2020, TruthMD entered into a ███████████████ to have substantially all of its ███████████ acquired by a ███████████ of a ██████████████████ for an enterprise value of ██████████ (the "Acquisition").

56.    Dr. Malkani did not consent to the Acquisition, as is required under the Purchase Agreement.

## <u>Defendants Improperly Authorize the Company To Issue 180 CVR Units To The Manager Defendants.</u>

57.     While negotiating the Acquisition, and on the eve of signing a letter of intent for the acquisition, the Controllers improperly authorized the issuance of 180 CVR Units to the Manager Defendants, almost doubling the number of units outstanding on a fully diluted basis and transferring a substantial percentage of the eventual sale proceeds to the Manager Defendants.

58.     The Controllers had no authority to authorize the issuance of such CVR Units.

59.     The Controllers' improper authorization of CVR Units was done in bad faith and in breach of the Manager Defendants' fiduciary duties to TruthMD and its unitholders, including Plaintiffs.

60.     Each of the Manager Defendants was directly self-interested in the decision to authorize the issuance of CVR Units to themselves and engaged in deliberate conflicts of interest, self-dealing, and breaches of fiduciary duties.

61.     Furthermore, the Manager Defendants paid inadequate or no consideration for the issuance of the CVR Units.

62.     The Controllers authorized the issuance of the CVR Units with no legitimate business purpose and solely to enrich the Manager Defendants at the expense of Plaintiffs and other unitholders.

63.     By approving the CVR Units, the Controllers authorized the Company

to almost double the number of outstanding units for the Manager Defendants and effectively halved the residual interest of all other unitholders, including Plaintiffs, in a substantial portion of the consideration to be paid in connection with the Acquisition. The Controllers did this to enrich the Manager Defendants by an extra potential $56 million.

64.    Defendant Cunningham admitted that that the issuance of CVR Units was a self-granted "Bonus" that she and the other Manager Defendants "feel we deserve" for supposedly increasing the consideration the private equity group is paying to acquire TruthMD.

## The Current Acquisition Structure and Manager Earn-out Distribution

65.    After learning of the Company's decision to authorize the issuance of CVR Units, Plaintiffs and other unitholders objected to the transaction as a self-interested attempt to dilute their interest in TruthMD and, consequently, the Acquisition proceeds.  The Controllers responded by abandoning the CVR Units but forging ahead with an updated Acquisition structure that achieves the same goal—diverting consideration from the Acquisition to the Managing Defendants and away from Plaintiffs as TruthMD unitholders (the "Current Acquisition Structure").

66.    Under the Current Acquisition Structure, the majority of consideration for the Acquisition comes in the form of a ████████████████████████████████ ██████    that is payable to TruthMD in ████ (the "████████████").

13

67.     Consistent with Section 4.7 of the LLC Agreement, the Current Acquisition Structure requires the Company to apply the 2024 Earn-out to satisfy any outstanding "Preferred Returns" owed to the Company's Preferred Members at the time the 2024 Earn-out is received.  The LLC Agreement defines a Preferred Return as "a cumulative amount equal to a 200% simple non-compounded return, calculated for each Preferred Member on the amount of all Capital Contribution Amounts actually received by the Company in cash for which Preferred Units were issued."  LLC Agreement § 2.28.

68.     The Manager Defendants are Preferred Members, and thus receive Preferred Returns.

69.     Once the Company satisfies the outstanding Preferred Returns, or if it does not owe any Preferred Returns when the 2024 Earn-out is paid, the Company distributes a percentage of any remaining proceeds from the 2024 Earn-out (the "Residual Proceeds") directly to the Manager Defendants *via* a member distribution (*i.e.* the Manager Earn-out Distribution).  The Manager Defendants receive the following percentage of the Residual Proceeds pursuant to the Manager Earn-out Distribution:

Cunningham: 16.3793%

Rosen: 16.3769%

Wilson: 5.4664%

Overall Residual Proceeds: 38.22%

70.    By its terms, the Manager Earn-out Distribution is a distribution to the Manager Defendants in their capacity as members of TruthMD as opposed to compensation for managerial services.

71.    After the Preferred Returns are paid and the Manager Defendants receive the Manager Earn-out Distribution from the Residual Proceeds, the Company then distributes the balance of the 2024 Earn-out to TruthMD's unitholders pursuant to the LLC Agreement in accordance with their respective ownership interest (the "Final Distribution").

72.    Under Section 4.7 of the LLC Agreement, the Common Members have priority for any Final Distribution payments over the Preferred Members.

73.    Cunningham and Rosen are Common Members, and thus have priority for any Final Distribution payments over Plaintiffs (who are Preferred Members).

74.    The Controllers (including the Manager Defendants) are also Preferred Members, and thus also receive a portion of any Final Distribution payable to Preferred Members (including Plaintiffs).

75.    Cunningham and Rosen sought to further enrich themselves through

"Foregone Salary Payments."  Pursuant to the Current Acquisition Structure, the Foregone Salary Payments are payable to Cunningham and Rosen immediately upon closing of the Acquisition before any other distribution is made to unitholders.  The Foregone Salary Payments are unearned, unsupported by the Company's records, and excessive.

**The Controllers Improperly Authorize the Current Acquisition Structure.**

76.     A Board resolution and minutes produced in this action indicate that on September 21, 2020, the Controllers and non-party managers Miller and Stoltz voted to authorize the Current Acquisition Structure.  A copy of the Board resolution and minutes is attached hereto as Exhibit H.

77.     The minutes do not reflect that any of the Controllers recused themselves from the discussion or vote on the Current Acquisition Structure, even though they were interested in it.  Instead, the minutes reflect that the Controllers were present for the entire discussion and that St. John in fact led the discussion. The minutes further reflect that all of the Controllers voted "yes" to the Current Acquisition Structure.  Notably, the minutes also indicate that non-party manager Chelovich voted "no" to the Current Acquisition Structure.  *See* Exhibit H at TRUTHMD_0001529.

78.     The Manager Earn-out Distribution considerably reduces the amount of Acquisition proceeds that would otherwise be payable to Plaintiffs as Preferred

Members of TruthMD.

79.    The Controllers approved the Current Acquisition Structure, including the Manager Earn-out Distribution, for the purpose of improperly diverting proceeds from the Acquisition to the Managing Defendants at the expense of TruthMD's unitholders, including Plaintiffs.   But for the Controllers' self-dealing in connection with the Acquisition, the eventual consideration payable to Plaintiffs would be considerably greater.

80.    The Current Acquisition Structure is pre-authorized and will govern the Acquisition immediately upon the Acquisition's closing.   Thus, regardless of the consideration ultimately paid for the purchase of TruthMD, an excessive portion of sale proceeds will be distributed to the Manager Defendants pursuant to the Manager Distribution Earn-out.   Whatever the ultimate Acquisition price, the Current Acquisition Structure will operate to divert an unfair percentage directly to the Manager Defendants at the expense of other unitholders, including Plaintiffs.

81.    Cunningham testified at her deposition on February 19, 2021 that closing of the Acquisition is imminent. Specifically, she testified that the proposed purchaser has ███████████████ of TruthMD, "[n]ow we're just trying to get some of the wording correct on ██████████████████" and "[i]f we had an ██████████████████ could have been done already."

82.    As managers and officers of TruthMD, however, the Controllers

already had a fiduciary duty to TruthMD and its unitholders to negotiate the highest acquisition price, without lining the Manager Defendants' pockets in the process.

83.    Moreover, non-party St. John was and is integral to negotiating the Acquisition and structuring the Current Acquisition Structure in his capacity as a managing member and CFO of TruthMD.  While negotiating the Acquisition, St. John advanced his own interests and the interests of the Manager Defendants instead of the interests of all TruthMD unitholders, including Plaintiffs.

84.    In early September 2020—before the Current Acquisition Structure was approved—Cunningham and Rosen were trying to convince the Board to accept their proposal to grant themselves the CVR Units in addition to a lavish "transaction bonus" as part of the Acquisition.  Wilson, a significant TruthMD unitholder himself, initially opposed Cunningham and Rosen's proposal as excessive.  St. John saw an opportunity, and used this Board division to advance his personal interests.

85.    On September 9, 2020, St. John sent to Wilson a draft email that St. John had ghostwritten for Wilson (the "Ghostwritten Email").  The draft of the Ghostwritten Email, addressed to Cunningham and ostensibly "from" Wilson, stated that Cunningham's and Rosen's proposed "transaction bonus" was "overly aggressive" and that their proposed "Unit bonus" should be revised.  St. John went on to write:  "I also think that *Morgan [St. John] and Al are entitled to Transaction Bonuses.  You know what Morgan has done for the Company . . . .*"  (Emphasis

added).   St. John's Ghostwritten Email then stated:   "My proposal is that the Company award the following transaction bonuses to Morgan and Al:  *-For Morgan: $100k at Closing and the equivalent of 2 more units in the earnout*."   (Emphasis added).  The draft of the Ghostwritten Email concluded:  "If you are in agreement with the above, I am prepared to fight for it if necessary, with the rest of the Board."

86.    Within a few hours of receiving St. John's Ghostwritten Email from St. John, Wilson sent the Ghostwritten Email—without copying St. John and ostensibly from Wilson—to Cunningham.  When Cunningham responded to Wilson the next day, Wilson forwarded her response to the Ghostwritten Email to St. John's personal email address—reflecting that Wilson and St. John continued to work together covertly to advance their own personal interests.

87.    Two days later, on September 11, 2020, St. John asked TruthMD's investment bank, Equiteq, Inc. ("Equiteq"), to confirm that that Wilson would also receive CVR Units in connection with the Acquisition.  Equiteq so confirmed.

88.    In other words, St. John exploited a divided Board to covertly advocate for a lucrative transaction bonus and TruthMD unit issuance to himself.  St. John used his position at TruthMD to advocate for Wilson's personal financial interest by securing Wilson's right to receive CVR Units and the Manager Earn-out Distribution, while Wilson, in exchange, advocated for St. John's personal financial interest.   Neither one of them was advocating for the interests of TruthMD's

unitholders, despite their obligations to do so as managers and officers of TruthMD.

89.    Because at least four of the six managers who voted in favor of the Manager Earn-out Distribution (Cunningham, Rosen, Wilson, and St. John) were interested in the transaction, approval of the Manager Earn-out Distribution was interested and, therefore, subject to the entire fairness standard of review.

90.    Plaintiffs are not aware of any fairness opinion in connection with Defendants' issuance of CVR Units to themselves as a "bonus," the Manager Earn-out Distribution, or the Foregone Salary Payments.

91.    Defendants never advised Plaintiffs of such a purported vote or about the issuance of CVR Units, the Manager Earn-out Distribution, or Foregone Salary Payments until after the fact.

92.    After Plaintiffs challenged the planned issuance of CVR Units in September and October 2020, Defendants manufactured a "Manager's Certificate" dated October 14, 2020, which purports to belatedly certify a September 21 vote on the Current Acquisition Structure as allegedly approved by a majority of disinterested managers.  In creating the Manager's Certificate, Defendants appear to have relied on Section 5.6 of the LLC Agreement, which provides:

> **Fees and Compensation.** Nothing herein shall preclude payment of compensation to any of the Managers for services performed on behalf of the Company; provided, however, that such compensation shall be approved by a majority of the disinterested Managers, in their reasonable discretion.

Ex. A, LLC Agreement § 5.6 (emphasis added).

93.    Section 5.6. on its face does not apply to the Manager Earn-out Distribution, however, because Section 5.6 can apply only to "compensation to any of the Managers for services performed on behalf of the Company." The Manager Earn-out Distribution is not compensation, nor is it for "services performed on behalf of the Company." Instead, as the September 21 Board resolution makes clear, the Manager Earn-out Distribution is a "*special sharing of proceeds* with respect to . . . ███████████████████ (if any) following the Company's achievement of certain ██████████████████ targets" that "certain *Members* have . . . agreed to accept." Exhibit H at TRUTHMD_0001527 (emphasis added).

94.    The "Manager's Certificate" therefore has no legal significance.

95.    Despite repeated requests from Plaintiffs before this action was filed, Defendants refused to provide documentation identifying which *disinterested* managers approved or voted on the issuance of CVR Units, Manager Earn-out Distribution, or Foregone Salary Payments until after Plaintiffs initiated litigation and pursued discovery.

96.    Instead of negotiating on behalf of all TruthMD unitholders, the Controllers continue to negotiate the Acquisition to advance their own interests in order to funnel the greatest possible amount of proceeds away from Plaintiffs and other non-Controllers, including via the Manager Earn-out Distribution and

Foregone Salary Payments. But for the Controllers hindering the Acquisition in an effort to increase the amount of consideration paid directly to the Manager Defendants, the Acquisition would have already closed on terms considerably more favorable to Plaintiffs. The Controllers' self-dealing in connection with the Acquisition continues to and has at all times hindered the Company's sale and prevented the Acquisition from closing.

97.    In addition, despite Plaintiffs' pending discovery requests, Defendants have failed to provide updated documents related to the Acquisition or even confirm the scheduled closing date.

## COUNT I

## BREACH OF FIDUCIARY DUTY

98.    Plaintiffs incorporate by reference each of the foregoing allegations.

99.    At all times relevant, Plaintiffs were members of TruthMD.

100.    As a managing member and as the CEO of TruthMD, Cunningham owes Plaintiffs fiduciary duties of loyalty and care.

101.    As a managing member of TruthMD and the Medical Director of TruthMD, Rosen owes Plaintiffs fiduciary duties of loyalty and care.

102.    As a managing member and as the Chairman of TruthMD, Wilson owes Plaintiffs fiduciary duties of loyalty and care.

103.    The Manager Defendants breached their fiduciary duties by engaging

in a transaction in which they had a material conflict of interest and by engaging in self-dealing in connection with the structuring of the Acquisition, including the authorization of the Manager Earn-out Distribution and hindering the Acquisition from closing in order to increase the amount of sale consideration paid directly to the Manager Defendants.

104.    The Manager Earn-out Distribution is a self-interested attempt to divert the proceeds of the sale of TruthMD from the unitholders generally (including Plaintiffs) to the Manager Defendants.

105.    As a result of the Manager Defendants' breaches of their fiduciary duties, Plaintiffs have suffered and continue to suffer damages and irreparable harm.

## COUNT II

## SPECIFIC PERFORMANCE

106.    Plaintiffs incorporate by reference each of the foregoing allegations.

107.    A valid contract exists between TruthMD and Dr. Malkani pursuant to which Dr. Malkani is entitled to warrants to purchase 12 units of TruthMD.

108.    TruthMD has issued Dr. Malkani warrants for only 9 units.

109.    Dr. Malkani has performed all of his obligations under the parties' agreement.

110.    The balance of equities is in favor of Dr. Malkani, who would not have entered into the Purchase Agreement for fewer than 12 warrants.

## COUNT III

### DECLARATORY JUDGMENT

111.    Plaintiffs incorporate by reference each of the foregoing allegations.

112.    An actual controversy regarding the validity of the March 2020 Note and the Purchase Agreement exists between TruthMD and Dr. Malkani.

113.    In particular, TruthMD and Dr. Malkani dispute the existence and validity of (a) the March 2020 Note and related obligations, (b) the conversion provisions of Paragraph 4 of the March 2020 Note (c), TruthMD's covenant in paragraph 4 of the March 2020 Note not to issue or authorize any form of limited liability company interests, including "profit interests," or other equity securities that are not denominated in the form of a "Unit"; and (d) the Purchase Agreement's prohibition on TruthMD undergoing a change in control or management structure during the term of the March 2020 Note without Dr. Malkani's consent.

114.    This controversy involves the rights or other legal relations of Dr. Malkani, is a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim, is a controversy between parties whose interests are real and adverse, and is a controversy with issues that are ripe for judicial determination.

115.    TruthMD has executed the March 2020 Note and the Purchase Agreement and both parties have performed or substantially performed under these agreements, including Dr. Malkani funding the New Advance to TruthMD.

116.   Dr. Malkani seeks a judicial declaration that the terms of the March 2020 Note and the Purchase Agreement are valid and enforceable.

## COUNT IV

### BREACH OF CONTRACT

117.   Plaintiffs incorporate by reference each of the foregoing allegations.

118.   The Purchase Agreement prohibits TruthMD undergoing a change in control or management structure during the term of the March 2020 Note without Dr. Malkani's consent.

119.   Dr. Malkani has not consented to the Acquisition and by proceeding with the Acquisition, the Defendants have caused TruthMD to breach the Purchase Agreement, by which breach Dr. Malkani will be irreparably harmed.

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment:

(i)    Preliminarily and permanently enjoining the Acquisition from proceeding without Dr. Malkani's written consent and without complying with the applicable procedures in the LLC Agreement;

(ii)    Declaring the Manager Earn-out Distribution void;

(iii)    Holding the Manager Defendants liable to Plaintiffs for damages for their breaches of their fiduciary duties;

(iv)    Holding Defendants liable to Dr. Malkani for damages for breach of the March 2020 Note and the Purchase Agreement;

25

(v)    Ordering specific performance of TruthMD's obligation to issue Dr.

Malkani three additional warrants;

(vi)    Declaring that the terms of the March 2020 Note and the Purchase

Agreement are valid and enforceable;

(vii)   Awarding Dr. Malkani all attorneys' fees, costs, and expenses of

enforcing his rights under the Purchase Agreement pursuant to Section 10.10 of the

Purchase Agreement;

(viii)  Awarding Plaintiffs their reasonable attorneys' fees and costs;

(ix)    Awarding Plaintiffs pre- and post-judgment interest; and

(x)     Granting such other relief as is just and proper.

|  | ASHBY & GEDDES |
|---|---|
| Dated: June 28, 2021 | |
| | */s/ Philip Trainer, Jr.* |
| | Philip Trainer, Jr. (#2788) |
| | Marie M. Degnan (#5602) |
| | Randall J. Teti (#6334) |
| | 500 Delaware Avenue |
| | Wilmington, DE 19801 |
| | 302-654-1888 |
| | |
| | Marcos Daniel Jimenez |
| | Marcos D. Jimenez, P.A. |
| | 255 Alhambra Circle – 8th Floor |
| | Miami, Florida 33134 |
| | Tel: 305.740.1975 |
| | |
| | Scott B. Cosgrove |
| | Jeremy L. Kahn |
| | LEÓN COSGROVE, LLP |
| | 255 Alhambra Circle – 8th Floor |
| | Miami, Florida 33134 |

Telephone: 305.740.1975
Facsimile: 305.437.8158
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on July 6, 2021, a copy of the foregoing

document was caused to be served on the following counsel of record by File &

Serve*Xpress*:

>     Michael C. Heyden, Jr.
>     Tianna S. Bethune
>     GORDON REES SCULLY
>       MANSUKHANI, LLP
>     1000 North West Street, 12th Floor
>     Wilmington, DE 19801


>                         */s/ Marie M. Degnan*
>                         Marie M. Degnan (#5602)