## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RED DRAGON PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 24-450-JLH-SRF |
| | ) | |
| v. | ) | |
| | ) | |
| TRUTHMD, LLC, GEMMA | ) | |
| CUNNINGHAM, CHARLES D. ROSEN, | ) | |
| GARY L. WILSON, and MORGAN | ) | |
| ST. JOHN, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER TO THE COMPLAINT WITH AFFIRMATIVE DEFENSES

Defendants TruthMD, LLC ("TruthMD" or the "Company"), Gemma Cunningham, Morgan St. John, Gary L. Wilson, and Dr. Charles D. Rosen, answer Plaintiff's Complaint and assert affirmative defenses as follows:

## INTRODUCTION[1]

1.     From late 2018 through the present, the Defendants have engaged in a fraudulent scheme to hide from investors and lenders onerous terms of a $400,000 loan made by Wilson ("the Wilson Loan"), the Chairman of TruthMD. The onerous terms gave Wilson the right to convert the loan into a significant percentage of the Company's units, thereby severely diluting the other unitholders. The loan's draconian terms, which Wilson and St. John referred to as the "nuclear option" in their own backchannel discussions ("Nuclear Option"), benefitted Wilson to the detriment of TruthMD's other members. As admitted by TruthMD's counsel, the Wilson Loan was a material fact that investors would want to consider prior to any purchase of units in the Company.

---

[1] Defendants retain the headings of the Complaint for ease of reference only.  To the extent those headings are construed to constitute affirmative allegations, those allegations are denied.

**RESPONSE:  Defendants deny the allegations of the first, second, and third sentences of this paragraph except to admit that Wilson and St. John, in some instances, referred to the preliminary conversion terms of the Wilson Loan as the "nuclear option."  The fourth sentence of this paragraph refers to trial testimony, which speaks for itself, and Defendants deny any characterizations thereof.**

2.      This fraudulent scheme induced Plaintiff Red Dragon, at the time a member of the Company, to purchase three (3) additional Units and pay a loan on behalf of TruthMD in exchange for one (1) additional Unit.

**RESPONSE: Denied.**

3.      If Plaintiff had known about the undisclosed Wilson Loan and its draconian Nuclear Option, it would not have further invested in the Company.

**RESPONSE: Defendants lack information sufficient to admit or deny the allegations of this paragraph and therefore deny the same and demand strict proof thereof at the time of trial.**

4.      Additionally, Red Dragon purchased three (3) of the four (4) Units in September 2020 on the express understanding that Red Dragon was acquiring the membership units of an existing investor and not purchasing newly-issued units which would dilute other investors. Though Red Dragon repeatedly stated that it only wanted to purchase previously issued units, TruthMD instead issued new units to Red Dragon. If Red Dragon had known about this undisclosed material fact, it would not have purchased the three (3) units.

**RESPONSE: Defendants deny the first and second sentences of this paragraph.  As to the third sentence, Defendants lack information sufficient to admit or deny the allegations**

of this paragraph and therefore deny the same and demand strict proof thereof at the time of trial.

5.      Defendants conspired to commit these fraudulent actions, with each Defendant separately taking steps to complete the overall fraud by concealing the existence of the Wilson Loan's Nuclear Option from all investors and lenders.

**RESPONSE: Denied.**

6.      The TruthMD Defendants' actions violated federal securities law and Florida state law.

**RESPONSE: Denied.**

## THE PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Red Dragon is a Florida limited liability company based in Deerfield Beach, Florida. Its sole member is Dr. Shailesh Gupta ("Dr. Gupta"). Red Dragon purchased, at various times, five (5) shares in the Company. Red Dragon is a Preferred Member of TruthMD. Red Dragon conducts business in Deerfield Beach, Florida.

**RESPONSE: It is admitted only that Red Dragon is a Florida limited liability company that purchased Preferred Units of the Company.  Defendants lack information sufficient to admit or deny the remaining allegations of this paragraph.**

8.      Defendant TruthMD is a Delaware limited liability company with its principal place of business in Alpharetta, Georgia. Defendant TruthMD actively conducted business in Florida through its long-term solicitation of investments by and loans from Florida residents, including its representatives' phone calls and other communications with Red Dragon and Dr. Sunil Malkani ("Dr. Malkani"), another investor and the Company's most significant non-insider lender.

TruthMD also conducted business in Florida through Cunningham's visits to and meetings with Dr. Gupta and Dr. Malkani in Florida.

**RESPONSE: Defendants admit the first sentence of this paragraph. The remainder of the allegations of this paragraph are conclusions of law to which no responsive pleading is required. To the extent a response is deemed required, those allegations are denied.**

9.    Defendant Cunningham is TruthMD's Chief Executive Officer and a member of TruthMD's Board of Managers ("Board"). At all material times, Cunningham conducted TruthMD business in Florida through phone calls and other communications with Red Dragon and Dr. Malkani, as well as in-person meetings in Florida with Dr. Gupta and Dr. Malkani.

**RESPONSE: Defendants admit the first sentence of this paragraph. The remainder of the allegations of this paragraph are conclusions of law to which no responsive pleading is required. To the extent a response is deemed required, those allegations are denied.**

10.    Defendant St. John functioned as TruthMD's Chief Financial Officer but has no official title with the Company. He is on the Board of Managers. At all material times, St. John conducted TruthMD business in Florida through phone calls and other communications with Red Dragon and Dr. Malkani regarding their investments in and loans to the Company.

**RESPONSE: Defendants deny the first sentence of this paragraph. Defendants admit the second sentence of this paragraph. The remainder of the allegations of this paragraph are conclusions of law to which no responsive pleading is required. To the extent a response is deemed required, those allegations are denied.**

11.    Defendant Wilson is TruthMD's Chairman of the Board. Wilson has testified that he and St. John are business associates, and that St. John has been his "friend and colleague for

4

decades." At all material times, Wilson conducted TruthMD business in Florida through phone calls and other communications with Dr. Malkani.

**RESPONSE: Defendants admit the first sentence of this paragraph.  The second sentence of this paragraph refers to trial testimony, which speaks for itself, and Defendants deny any characterizations thereof. The remainder of the allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a response is deemed required, those allegations are denied.**

12.     Defendant Dr. Rosen is a member of the TruthMD's Board of Managers and, at all material times, conducted TruthMD business in Florida through phone calls and other communications with Dr. Malkani. He also served as the Company's medical officer. Dr. Rosen is married to Defendant Cunningham.

**RESPONSE: Defendants admit that Rosen is a member of  TruthMD's Board of Managers, is the Company's Chief Medical Officer, and is married to Defendant Cunningham.  The remainder of the allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a response is deemed required, those allegations are denied.**

13.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff brings claims under the federal Securities Exchange Act ("Exchange Act") 15 U.S.C. § 78a and rules promulgated by the Securities and Exchange Commission ("SEC"). The Court's supplemental jurisdiction is invoked for Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Additionally, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of different states.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required. To the extent a response is deemed required, those allegations are denied.**

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Southern District of Florida, where Red Dragon and Dr. Gupta reside.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required. To the extent a response is deemed required, those allegations are denied.**

## FACTUAL ALLEGATIONS

**Defendants**

15.    TruthMD is a Delaware limited liability company founded by Defendant Gemma Cunningham, a/k/a Gemma Turi, Defendant Rosen, and non-party Dr. Kourosh Maddahi in 2012. The Company provides data solutions to managed care organizations, healthcare insurers, and government agencies throughout the United States.

**RESPONSE: Admitted.**

16.    At all material times, Cunningham, Rosen, Wilson, and St. John were members of TruthMD's Board of Managers (the "Board").

**RESPONSE: Admitted.**

17.    At all material times, Wilson served as Chairman of the Board and as such was responsible for governance.

**RESPONSE: Defendants admit that Wilson served as Chairman of the Board at all relevant times. Allegations that Wilson was "responsible for governance" are vague and therefore denied.**

18.     At all material times, St John functioned as TruthMD's Chief Financial Officer and had detailed knowledge of the Company's membership interests and debt structure.

**RESPONSE: Defendants deny that St. John ever functioned as TruthMD's Chief Financial Officer. Defendants admit that St. John had some knowledge of the Company's membership interests and debt structure.**

19.     At all material times, TruthMD's Third Amended and Restated Limited Liability Company Agreement ("Operating Agreement") provided that the Company's ownership structure consists of one class of common members that own the Company's common units (the "Common Members"), as well as various classes of preferred members that own the Company's preferred units (the "Preferred Members"). The Company's preferred units were subdivided into Series A through Series F based on the timing of their issuance.

**RESPONSE: Defendants deny that the Third Amended and Restated Limited Liability Company Agreement was the relevant Operating Agreement at all times material to this action. The remainder of this paragraph refers to that document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

20.     Pursuant to the Operating Agreement, the Board is responsible for managing the business and affairs of TruthMD.

**RESPONSE: This paragraph refers to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

**The Wilson Loan and its Nuclear Option**

21.     Unknown by Red Dragon—and apparently unknown by any of TruthMD's investors other than Cunningham, St. John, Rosen, and Wilson—TruthMD had been, since approximately December 6, 2018, burdened with the Wilson Loan which materially impacted all investments in and loans to TruthMD.

**RESPONSE: Denied, except to admit that the Wilson Loan was in place since about the date stated.**

22.     The Wilson Loan was made when the Company needed funds to continue to operate. Wilson took advantage of this posture to demand loan terms that would potentially result in a large dilution to existing shareholders.

**RESPONSE: Defendants admit the first sentence of this paragraph and deny the second sentence of this paragraph.**

23.     The Nuclear Option contained in the Wilson Loan allowed Wilson to take a significant percent of TruthMD's equity and control its Board, at his election.

**RESPONSE: Denied.**

24.     Wilson also requested—and obtained—extensive details about Dr. Malkani's loans—but Dr. Malkani did not receive the same information about Wilson's loans despite repeated requests during an extensive period by Dr. Malkani and his counsel for complete information regarding the Company's convertible loans.

**RESPONSE: Denied.**

8

25.    Wilson demanded protection for his loans because he believed the Company might have to file for bankruptcy and he did not view Cunningham and Rosen as reliable business partners. Wilson believes that Cunningham and Rosen "are basically bad people in my opinion when it comes to partnership/business." He based his opinion on "[t]en years of dealing with them." Yet Wilson remained on the Board as its Chair and has continued his involvement with the Company.

**RESPONSE: The allegations of the first, second, and third sentences of this paragraph refer to trial testimony which speaks for itself.  Defendants deny any characterization of that testimony which is inconsistent with its text.  Defendants admit that Wilson was on the Board as its Chair and had continued involvement with the Company at all material times.**

26.    Wilson's demand for protection and his opinion of Cunningham and Rosen were never disclosed to Red Dragon, Dr. Malkani, or to any other non-insider investor in or lender to the Company.

**RESPONSE: Defendants admit that Wilson's negotiations with respect to the Wilson Loan were not disclosed to the general constituency of the Company.  All remaining allegations are denied.**

27.    Wilson described his demand for protection as follows: "[A]ll the 'new money' must fund at once if I am to participate. i don't want to advance 400k in December & then face bankruptcy in January where i only 'new money' that loses . . . however you are not going to like the terms to the 'new money' & and my suggest is u appoint a competent independent person to negotiate the deal for u – curt [Curt Barwick, the Company's outside counsel] or morgan [Defendant St. John] come to mind."

**RESPONSE: The allegations of this paragraph refer to deposition testimony which speaks for itself. Defendants deny any characterization of that testimony which is inconsistent with its text.**

28.    In December 2021, Wilson confirmed that the Nuclear Option gave him "a right to buy, I think it was 40 percent of the stock at a nominal price if things didn't occur."

**RESPONSE: The allegations of this paragraph refer to deposition testimony which speaks for itself. Defendants deny any characterization of that testimony which is inconsistent with its text.**

29.    None of this was ever disclosed to Dr. Gupta, Dr. Malkani, or any other non-insider investor in or lender to the Company.

**RESPONSE: Defendants admit that the preliminary conversion terms of the Wilson Loan were not disclosed to the general constituency of the Company. These preliminary conversion terms were later abandoned and not presented to the Board of the Company. All remaining allegations are denied.**

30.    Plaintiff discovered the existence of the Wilson Loan and its Nuclear Option in December 2021 when Wilson testified in a case pending against the Company in another jurisdiction. Defendants in that case have objected to producing and publicly disclosing the Company's documents related to the Wilson Loan. The Defendants' refusal to produce and publicly disclose the documents related to the Wilson Loan is part of the Defendants' fraudulent scheme, which is ongoing.

**RESPONSE: Denied.** 31.    There were additional loans from Wilson to TruthMD. Due to Defendants' objections, Plaintiff does not know the specific terms of those loans, including any other onerous terms that the loan documents may contain.

**RESPONSE: Defendants admit the first sentence of this paragraph and deny the second sentence of this paragraph.**

**Red Dragon**

32.    Red Dragon first purchased one (1) Series B Unit in 2017 for $200,000. Dr. Gupta, purchasing this unit on behalf of Red Dragon, understood this Unit to be purchased directly from Cunningham, and not newly issued for his purchase.

**RESPONSE: Defendants admit the first sentence of this paragraph and deny the second sentence of this paragraph.**

33.    Then, in 2019 and 2020, Red Dragon paid a loan on behalf of TruthMD, and, when payment was complete, in return received one (1) Series F Unit in summer 2020.

**RESPONSE: Admitted.**

**Red Dragon's Purchase of Three (3) Additional Units**

34.    In early September 2020, Cunningham approached Dr. Gupta and proposed that Red Dragon purchase additional units. Red Dragon again specified that Red Dragon only wanted to purchase existing units. Cunningham assured Dr. Gupta that the units would be transferred by an existing investor.

**RESPONSE: Denied, except to admit that there were discussions regarding Red Dragon's purchase of additional units in the referenced timeframe.**

35.    On September 11, 2020, Dr. Gupta received from St. John and Cunningham a spreadsheet ("the Waterfall") prepared in connection with a potential acquisition of the Company. The Waterfall had been edited that evening by St. John to reflect the three units in the process of being purchased by Red Dragon. The Waterfall contained no mention of the Nuclear Option and

did not indicate that it was convertible at Wilson's option to obtain a very significant percentage of the Company at a nominal price.

**RESPONSE: Defendants admit that a Waterfall, prepared by the Company's outside investment banker, was transmitted on or about the date stated and that St. John provided input on the document. Defendants admit that the Nuclear Option was not mentioned in the Waterfall but deny that this preliminary conversion provision was in effect as described in the Complaint when the Waterfall was distributed.**

36.     On September 12, 2020, Dr. Gupta met via Zoom with St. John, Cunningham, and a third party. In that meeting, Dr. Gupta specified that Red Dragon was interested in purchasing units only if the units were being transferred from another investor. Dr. Gupta did not want to dilute existing shareholders. Cunningham represented that the three units being transferred to Red Dragon were existing units being transferred from someone who needed to "cash out" due to a divorce proceeding.

**RESPONSE: Denied, except to admit that there were discussions regarding Red Dragon's purchase of additional units in the referenced timeframe.**

37.     Relying on the Waterfall and the subsequent September 12, 2020, conversation with St. John and Cunningham, Red Dragon agreed to purchase three (3) additional Series F Units.

**RESPONSE: Denied, except to admit that Red Dragon agreed to purchase three (3) Series F Units on or about the date stated.**

38.     On September 15, 2020, Cunningham sent Red Dragon the executed paperwork confirming Red Dragon's purchase of three (3) Series F Units. Red Dragon wired $750,000 to the Company in exchange for these units.

**RESPONSE: Admitted.**

12

39.    Red Dragon would not have purchased the three (3) Series F Units if it had known about the Wilson Loan and its Nuclear Option.

**RESPONSE: Defendants lack information sufficient to admit or deny the allegations of this paragraph and therefore deny the same and demand strict proof thereof at the time of trial.**

**The True Origin of Red Dragon's Three (3) Units**

40.    The three (3) Units sold to Red Dragon were not existing units, but instead were newly issued and therefore dilutive of other units—despite Cunningham's assurances otherwise.

**RESPONSE: Denied, except to admit that the three (3) Units were newly issued Units.**

41.    Had Red Dragon been aware of the true origin of the units purchased in September 2020, Red Dragon would not have purchased the three (3) Series F Units that it purchased in September 2020.

**RESPONSE: Denied.**

**TruthMD's Pattern of Hiding the Wilson Loan with its "Nuclear Option"**

42.    The Defendants' fraudulent scheme included the decision of all Defendants to conceal the existence of the Wilson Loan and its Nuclear Option in all communications with and Company documents provided to members, lenders, potential investors, and potential lenders.

**RESPONSE: Denied.**

43.    For example, a balance sheet dated December 31, 2018, and provided to Members on February 21, 2019—after the Wilson Loan—contained no mention of the units that Wilson could acquire through his loan.

**RESPONSE: Denied, except to admit that the referenced balance sheet was issued after the Wilson Loan and did not describe its preliminary conversion terms.  Further, the**

**Company's distributed financial statements have not typically described the specific terms of any of its loans beyond their principal amount and accrued interest.**

44.     The Defendants' interactions with Dr. Malkani are another example. Dr. Malkani first learned of TruthMD from Dr. Gupta. Dr. Malkani and Dr. Gupta are friends. Therefore, Cunningham and the other Defendants were aware that Dr. Malkani could share important information, such as the Wilson Loan's Nuclear Option, with Dr. Gupta.

**RESPONSE: Denied, except to admit that Cunningham was aware that Malkani and Gupta were friends and could conceivably share information.**

45.     Dr. Malkani first invested in and became a member of TruthMD in 2016 when he invested $498,000 in exchange for three of TruthMD's Series E preferred units at a purchase price of $166,000 per unit.

**RESPONSE: Admitted.**

46.     Between 2017 and 2020, at the urging of the Defendants, Dr. Malkani loaned more than $2,000,000 to TruthMD to meet the Company's pressing capital needs. Dr. Malkani is the Company's most significant non-insider lender.

**RESPONSE: Denied, except to admit that Malkani loaned a principal amount less than $2,000,000.**

47.     Around the time that Truth MD through Cunningham was working to obtain additional capital from Dr. Malkani in November 2018, and unbeknownst to Dr. Malkani, Cunningham was also negotiating with Wilson regarding the Wilson Loan. The Board was trying to raise two million dollars and all potential lenders were insiders—except for Dr. Malkani.

**RESPONSE: Defendants admit that Cunningham was negotiating transactions with Malkani and Wilson in the time-frame stated. Defendants lack knowledge or information**

sufficient to admit or deny whether Malkani knew of the coextensive negotiations. Defendants deny the second sentence of this paragraph.

48.     Dr. Malkani made additional advances to TruthMD throughout 2019 and 2020, often on short notice based on Cunningham's representations that TruthMD needed capital to stay in business and pay its employees.

**RESPONSE: Defendants admit that Malkani made advances to the Company during this timeframe, that some advances were arranged quickly, and that the Company needed capital to stay in business and pay its employees at times during this period. Any remaining allegations are denied.**

49.     These additional advances brought the total principal amount of Dr. Malkani's loans to TruthMD to $2,255,953.

**RESPONSE: Denied.**

50.     During all their communications with Dr. Malkani, Defendants never revealed the existence of the Wilson Loan and its Nuclear Option. Indeed, despite multiple, specific inquiries by Dr. Malkani and his counsel, Dr. Malkani was never informed about the Wilson Loan and its Nuclear Option.

**RESPONSE: Denied.**

51.     For example, in March 2019, Dr. Malkani through his counsel specifically requested "the most recent cap table with all...convertible debt. Please also send the form of purchase agreement and note for the secured convertible debt that is already outstanding."

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

52.     In response, the Company through its counsel responded: "sorry [sic] this is kept by the CFO and he is not currently available." As in all other communications with Dr. Malkani and Red Dragon, this was part of the scheme to conceal the Wilson Loan and its Nuclear Option.

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

53.     On April 8, 2019, Dr. Malkani, through his counsel, again requested a list of all convertible debt, stating that "Nothing I have asked for here is unusual..."

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

54.     That same day, in response, Cunningham sent an e-mail stating that "there are approximately $917K of Convertible Notes outstanding. These Convertible Notes are unusual in that they are convertible at the option of the Company not the holder..." (emphasis in original). This was false for at least two reasons: (1) it did not include the Wilson Loan; and (2) the Wilson Loan was convertible at Wilson's discretion, not the Company's.

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

55.     On April 9, 2019, Dr. Malkani continued to request a "detailed list of all existing convertible debt or instruments and securities (notes, SAFES, Kisses etc.), and all outstanding options, warrants and rights that are issued and outstanding."

**RESPONSE: The allegations of this paragraph refer to a  document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

56.    No response or communication from the Company to Malkani or his counsel ever mentioned the Wilson Loan and its Nuclear Option.

**RESPONSE: Denied.**

57.    In reality, because the TruthMD Defendants were concealing the Wilson Loan from all investors and lenders, the Company refused to provide an accurate fully diluted capitalization table and a complete list of convertible debt in response to Dr. Malkani's repeated requests. Rather than reveal the Wilson Loan, TruthMD chose to deceive all lenders and investors, including Dr. Malkani.

**RESPONSE: Denied.**

58.    Throughout the time that Dr. Malkani lent money to the Company, Defendants continued to pressure Dr. Malkani for funds. Therefore, in late 2019, Dr. Malkani requested additional information from the Company.

**RESPONSE: Denied, except to admit that Cunningham and Malkani engaged in discussions regarding Malkani's actual or potential investment and/or loans to the Company and that Malkani made various requests for information in the timeframe stated.**

59.    In response, on December 18, 2019, Cunningham assured Dr. Malkani that "I don't believe there is any additional due diligence necessary." This implication that all had been revealed was patently false: the Wilson Loan and its Nuclear Option remained concealed.

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

60.    At another point, in January 2020, in response to Dr. Malkani's specific inquiries, Cunningham stated that only two other loans had priority over Dr. Malkani's loan. Cunningham never mentioned that other debts—such as the Wilson Loan—had onerous conversion terms like the Nuclear Option.

**RESPONSE: The allegations of the first sentence of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents. Defendants admit that the preliminary conversion terms of the Wilson Loan were not disclosed to Malkani. All remaining allegations are denied.**

61.    After March 2020, amidst the COVID-19 pandemic, TruthMD continued to seek advances from Dr. Malkani. When Dr. Malkani stated on April 27 that he could not advance another $110,00 immediately, Cunningham involved Rosen and Wilson to increase the pressure through calls and texts to Dr. Malkani.

**RESPONSE: Denied, except to admit that there were discussions between Malkani, Cunningham, Rosen, and Wilson, regarding investment in and/or loans to the Company in the referenced timeframe.**

62.    For example, on April 27, 2020, at 8:09 p.m., Cunningham texted Dr. Malkani: "We need something today – also we will now be shut down. So I'm not sure what to do – we were depending on your funding."

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

63.    Two minutes later, Cunningham again texted: "We will be totally shut down today. Out of business[.]"

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

64.    Six minutes after that, Rosen texted Dr. Malkani: "Sunil, TruthMD closes its doors if Signature doesn't get its 65k today. We didn't look to sell more equity to anyone after our agreement. This is not our 'routine' problem today. Do you have time to talk?"

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

65.    Several minutes later, Rosen again texted Dr. Malkani: "Fyi, they ARE shutting down our email, access to data and our customers TODAY."

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

66.    Later that evening, Cunningham texted Dr. Malkani: "You need to call me. We are either partners or not. You can't just do this to us. We need to work this out. Please call[.]"

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

67.     The next day, April 28, 2020, Wilson texted Dr. Malkani that TruthMD "really needs $100,000 of your commitment by tomorrow to keep operating" and "[if] we don't have $100,000 tomorrow we could lose our business which none of us want to happen. We need your help[.]"

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents.**

68.     Dr. Malkani wired $30,000 to TruthMD on April 30, 2020. In total, Dr. Malkani loaned $1,340,000 to TruthMD after the Wilson Loan and its Nuclear Option was executed.

**RESPONSE: Defendants admit the first sentence of this paragraph and deny the second sentence of this paragraph.**

69.     Furthermore, on August 25, 2020, shortly before Red Dragon purchased the three Class F membership units, Cunningham spoke with Dr. Gupta about the proposed buyout. Cunningham did not mention the existence of the Wilson Loan and its Nuclear Option during this conversation.

**RESPONSE: Defendants admit that there were communications between Cunningham and Gupta on or about the date stated. Defendants lack knowledge or information sufficient to admit or deny whether the Wilson Loan was discussed during this conversation.**

20

70.    In September 2020, Red Dragon finalized its purchase of three (3) Class F membership Units in TruthMD for $250,000 each. At no point in the associated discussions did any Defendant or other TruthMD representative disclose the existence of the Nuclear Option.

**RESPONSE: Defendants admit the first sentence of this paragraph. Defendants deny that the Nuclear Option was operative at the time the purchase closed. Any remaining allegations are denied.**

**The September 11, 2020 Waterfall**

71.    On September 11, 2020, St. John modified the Waterfall which contained an overview of the Company's financial situation, including membership unit ownership and the Company's debt profile. St. John and Cunningham sent the Waterfall to Dr. Gupta in the context of persuading him to purchase three (3) additional Units.

**RESPONSE: Defendants admit the first sentence of this paragraph insofar as St. John provided input on the Waterfall, which was prepared by the Company's outside investment banker. Defendants admit that Cunningham transmitted the Waterfall to Dr. Gupta and deny the remaining allegations of the second sentence of this paragraph.**

72.    The Waterfall did not contain any mention of the Nuclear Option and was thus fraudulently misleading.

**RESPONSE: Defendants admit that the Waterfall did not describe the Nuclear Option but deny that the Waterfall was false, fraudulent, or misleading.**

73.    The Waterfall specifically referenced the Wilson Loan, but the entry for the Wilson Loan in the Tab labeled "Gary Wilson" (Row 27, entry for $400,000) contains no explanation of any conversion rate—even though the conversion rate under the Nuclear Option would result in

21

conversion of a large number of the total Preferred Units of the Company and substantial dilution of other Units and control by Wilson.

**RESPONSE: The allegations of this paragraph refer to a document which speaks for itself, and Defendants deny any characterizations of that document that are inconsistent with its contents. Defendants deny that the Nuclear Option was operative at the time the Waterfall was circulated or that any conversion feature operated as described.**

74.    The Defendants never disclosed to Red Dragon that Wilson had onerous conversion rights in the form of the Nuclear Option at any time, including in the Waterfall at the time of Red Dragon's purchase.

**RESPONSE: Defendants admit that the preliminary conversion terms of the Wilson Loan were not described to Red Dragon and deny that its conversion features were operative at the time of the circulation of the Waterfall or Red Dragon's purchase.**

75.    St. John and Cunningham had a phone call with Dr. Gupta on September 12, 2020, to discuss the Waterfall. In that conversation, they continued to conceal the full terms of the Wilson Loan including the Nuclear Option.

**RESPONSE: Denied, except to admit that St. John participated in a phone call with Dr. Gupta on or about the date stated. Defendants lack knowledge or information sufficient to admit or deny that Cunningham participated in the referenced phone call.**

76.    The Defendants' coordinated deception continued on May 4 2021, when Cunningham sent an e-mail titled "Investor Update" to all TruthMD investors, attaching the FYE 2020 financial statements. This e-mail attached a Schedule of Members listing units owned by each member—with no mention of the many units that Wilson might obtain under the Nuclear Option.

**RESPONSE: Denied, except to admit that an Investor Update was circulated on or about the date stated and that the Schedule of Members did not describe the preliminary conversion terms of the Wilson Loan.**

**The Potential Acquisition and the Purported Amendment of the Wilson Loan**

77.    In late 2019, and throughout 2020, the Company pursued a potential transaction with a well-known firm that would result in the acquisition of the Company ("the Acquisition").

**RESPONSE: Denied, except to admit that the Company was involved in discussions regarding the Acquisition in 2020.**

78.    TruthMD has asserted that the Wilson Loan, which had been in place since in or around December 2018, was amended.

**RESPONSE: Admitted with the caveat that it was, in fact, amended.**

79.    As part of the potential Acquisition, the Company gave Wilson valuable rights upon acquisition that would dilute the Company's shareholders.

**RESPONSE: Denied.**

80.    TruthMD awarded those rights to Wilson at least in part due to Wilson's Loan and its Nuclear Option. At the same time that Wilson received those rights from the Company, Cunningham and St. John were simultaneously encouraging additional share purchases from investors, including Red Dragon, and were negotiating with the Company lenders, including Dr. Malkani.

**RESPONSE: Denied.**

81.    After Plaintiff and Dr. Malkani objected to the rights granted to Wilson and other insiders, Defendants held fast to an acquisition structure that preserves their unfair windfall. Defendants pre-authorized an excessive post-transaction "earn-out" to Cunningham, Rosen, and

Wilson, as well as a $3.66 million award of unearned "foregone salaries" payable to Cunningham and Rosen as soon as a sale of TruthMD is complete.

**RESPONSE: Defendants deny the allegations of the first sentence of this paragraph. Defendants admit that TruthMD's Board did approve an Earnout Payment Sharing arrangement and the payment of certain foregone salaries. All remaining allegations are denied.**

82.    Had Plaintiff Red Dragon been aware of the Wilson Loan and its Nuclear Option, Red Dragon would not have invested in TruthMD by (1) paying a loan on behalf of TruthMD in exchange for one (1) Unit in return or (2) purchasing three (3) additional Series F Units in September 2020.

**RESPONSE: Defendants lack knowledge or information sufficient to admit or deny this allegation and therefore deny the same and demand strict proof thereof at the time of trial.**

### CAUSES OF ACTION
### COUNT I
### (Violation of 15 U.S.C. § 78j and SEC Rule 10b-5)
### (Against All Defendants)

83.    Plaintiff incorporates Paragraphs Nos. 1-82 as if stated fully herein.

**RESPONSE: Defendants incorporate the preceding paragraphs of their Answer as though more fully set forth at length herein.**

84.    Section 10(b) of the Exchange Act, codified at 15 U.S.C. § 78(j), prohibits employing, in connection with the sale of any security, "any manipulative or deceptive device or contrivance" as defined by SEC rulemaking. In Rule 10b-5, the SEC clarified that Section 10(b) makes it unlawful, in connection with the sale of any security, (a) "To employ any device, scheme, or artifice to defraud"; (b) "To make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or (c) "To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

85.    The "Units" issued by Truth MD are securities within the meaning of the Exchange Act.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

86.    In connection with the sale of the Class F Units to Red Dragon, Defendants, through Defendant TruthMD, knowingly and intentionally participated or aided TruthMD in obtaining money or property from Plaintiff by means of untrue statements of material fact and omission of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

**RESPONSE: Denied.**

a.    Cunningham circulated multiple documents and communications to Plaintiff and shareholders, including a February 21, 2019, balance sheet and a May 4, 2021, "Investor Update," all of which concealed the existence of the Nuclear Options from Plaintiff and shareholders. Further, Cunningham concealed the existence of the Nuclear Option during communications with Red Dragon on August 25, 2020, and September 12, 2020. During those same communications, Cunningham affirmatively assured Dr. Gupta

that the units he planned to purchase were existing units. Cunningham further stood to benefit as one of the four insiders who would receive valuable rights and/or bonuses in the event of an acquisition.

**RESPONSE: Defendants admit that Cunningham circulated various documents, including a balance sheet and Investor update and had communications with Red Dragon. Defendants deny that these communications "concealed" the Nuclear Option from Plaintiff and shareholders. Defendants deny the allegations of the third sentence of this Paragraph. Defendants admit that Cunningham was one of the individuals that was included in the Earnout Payment Sharing that was approved by the Company's Board. All remaining allegations are denied.**

b.    St. John concealed from multiple investors and shareholders the existence of the Wilson Loan and its Nuclear Option. For example, St. John modified and sent to Dr. Gupta the Waterfall, which contained multiple misrepresentations designed to conceal the Nuclear Option, despite his knowledge of the same. During the September 12, 2020, meeting with Dr. Gupta, St. John neither disclosed the existence of the Wilson Loan nor corrected Cunningham's representations as to the origin of the three (3) units. Additionally, on April 15, 2019, St. John prepared and sent to Dr. Malkani a pro forma capitalization table that concealed the existence of the Wilson Loan.

**RESPONSE: Denied, except to admit that St. John provided input on the Waterfall (which was prepared by the Company's outside investment bankers) and pro forma capitalization table.**

c.    Wilson fraudulently concealed the existence of the Wilson Loan and its Nuclear Option from the Company's members and lenders, including Dr. Gupta during the

period in which Dr. Gupta purchased the three (3) Units and paid TruthMD's loan in exchange for another Unit, and in statements to Dr. Malkani on and around April 28, 2020, whom he pressured to continue to loan money to TruthMD. Wilson further stood to benefit as one of the four insiders who would receive valuable rights and/or bonuses in the event of an acquisition. In addition to his participation in the scheme to defraud, Wilson's mere silence on the Wilson Loan terms including the Nuclear Option constituted fraud because as Manager he owed a fiduciary duty to disclose the Wilson Loan terms to Red Dragon, who was a minority member at the time that Dr. Gupta was contemplating an additional purchase of three (3) units through Red Dragon.

**RESPONSE: Denied, except to admit that Wilson had communications with Malkani on or about the date stated and was one of the individuals that was included in the Earnout Payment Sharing that was approved by the Company's Board.**

   d. Rosen concealed the existence of the Wilson Loan and its Nuclear Option from all lenders, investors, and shareholders even as he pressured them to invest or loan money to TruthMD. Specifically, Rosen's failed to inform Dr. Gupta about the Nuclear Option during the period in which Dr. Gupta purchased the three (3) Units and paid TruthMD's loan in exchange for another Unit. Rosen's further statements to Dr. Malkani on and around April 27, 2020, concealed the existence of the Nuclear Option, which he knew about, while pressuring Dr. Malkani to loan money to TruthMD. Rosen further stood to benefit as one of the four insiders who would receive valuable rights and/or bonuses in the event of an acquisition. In addition to his participation in the scheme to defraud, Rosen's mere silence on the Wilson Loan terms including the Nuclear Option constituted fraud because as Manager he owed a fiduciary duty to disclose the Wilson Loan terms to

Red Dragon, who was a minority member at the time that Dr. Gupta was contemplating an additional purchase of three (3) units through Red Dragon.

**RESPONSE: Denied, except to admit that Rosen had communications with Malkani on or about the date stated and was one of the individuals that was included in the Earnout Payment Sharing that was approved by the Company's Board.**

87.    Red Dragon would not have purchased membership units in September 2020 or paid a loan on the Company's behalf in exchange for another unit but for the Company's fraudulent concealment of the Nuclear Option, and Defendants' misrepresentation of the true origin of the three (3) Units purchased in September 2020.

**RESPONSE: Denied.**

88.    TruthMD is liable under Section 10(b) of the Exchange Act and SEC Rule 10b-5.

**RESPONSE: Denied.**

89.    The Defendants' omission and misrepresentation disguised the significant latent dilution and control threats posed by the Nuclear Option, and the dilutive effect of purchasing new units. That inflated the value of all Units and harmed Plaintiff and shareholders.

**RESPONSE: Denied.**

**COUNT II**
**(Control Person Liability, 15 U.S.C. § 78t)**
**(Against Cunningham, St. John, Rosen, and Wilson)**

90.    Plaintiff incorporates Paragraphs Nos. 1-82 as if stated fully herein.

**RESPONSE: Defendants incorporate the preceding paragraphs of their Answer as though more fully set forth at length herein.**

91.    Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t, imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter."

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required. To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

92.    TruthMD is a person, as defined in the Exchange Act, that is liable under the Exchange Act, as alleged in Count I.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required. To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

93.    At all relevant times, Cunningham, St. John, Rosen, and Wilson served on TruthMD's Board of Managers. Additionally, at all relevant times, Cunningham served as CEO, Wilson served as Chairman of the Board, and St. John acted in the capacity of CFO.

**RESPONSE: Admitted, except that Defendants deny that St. John has ever acted in the capacity as CFO.**

94.    As managers, Cunningham, St. John, and Rosen, by virtue of their high-level positions, were aware of the Company's operations and intimate knowledge of the material misrepresentations disseminated to investors and lenders. Cunningham, St. John, Rosen, and Wilson had the power to control TruthMD's general business affairs when Red Dragon purchased its membership units in September 2020 and paid off a loan in exchange for another membership unit, as well as the power to control the specific corporate policies that resulted in TruthMD's primary violations, including the content and dissemination of the various statements that Plaintiff

contends were false and misleading. The Defendants had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required. To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

95.    Further, Wilson, in his role as Chairman, with his awareness of the Company's

operations and intimate knowledge of the material misrepresentations disseminated to investors and lenders and through his close relationships and work with other Defendants, was in a position to influence the reporting and dissemination of financial information to lenders and investors. Wilson was in a position to prevent the issuance of the statements or cause the statements to be corrected.

**RESPONSE: Denied.**

96.    Under § 20(a) of the Exchange Act, Cunningham, St. John, Rosen, and Wilson are

jointly and severally liable for TruthMD's violation of 15 U.S.C. § 78j.

**RESPONSE: Denied.**

**COUNT III**
**(Violation of Fla. Stat. § 517.301)**
**(Against All Defendants)**

97.    Plaintiff incorporates Paragraphs Nos. 1-82 as if stated fully herein.

**RESPONSE: Defendants incorporate the preceding paragraphs of their Answer as though more fully set forth at length herein.**

98.     It is a violation of Florida law to do any of the following in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security:

(1)     Employ any device, scheme, or artifice to defraud;

(2)     Obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

(3)     Engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

Fla. Stat. § 517.301(1)(a).

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

99.     The "units" issued by TruthMD are securities pursuant to Fla. Stat. § 517.021(21).

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

100. In connection with the sale of the Class F Units to Red Dragon and loans from Dr. Malkani, Defendants, through TruthMD, knowingly and intentionally participated or aided TruthMD in obtaining money or property from Plaintiff, lenders, and members by means of untrue statements of material fact and omission of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

**RESPONSE: Denied.**

a.    Cunningham circulated multiple documents and communications to Plaintiff and the Company's members, including a February 21, 2019, balance sheet and a May 4, 2021, "Investor Update," all of which concealed the existence of the Nuclear Option from Plaintiff and shareholders. Further, Cunningham concealed the existence of the Nuclear Option during communications with Red Dragon on August 25, 2020, and September 12, 2020. During those same communications, Cunningham affirmatively assured Dr. Gupta that the units he planned to purchase were existing units. Cunningham further stood to benefit as one of the four insiders who would receive valuable rights and/or bonuses in the event of an acquisition.

**RESPONSE: Defendants admit that Cunningham circulated various documents, including a balance sheet and Investor update and had communications with Red Dragon. Defendants deny that these communications "concealed" the Nuclear Option from Plaintiff and shareholders.  Defendants deny the allegations of the third sentence of this Paragraph. Defendants admit that Cunningham was one of the individuals that was included in the Earnout Payment Sharing that was approved by the Company's Board.  All remaining allegations are denied.**

b.    St. John concealed from multiple investors and shareholders the existence of the Wilson Loan and its Nuclear Option. For example, St. John modified and sent to Dr. Gupta the Waterfall, which contained multiple misrepresentations designed to conceal the Nuclear Option, despite his knowledge of the same. During the September 12, 2020, meeting with Dr. Gupta, St. John neither disclosed the existence of the Wilson Loan nor corrected Cunningham's representations as to the origin of the three (3) units. Additionally,

on April 15, 2019, St. John prepared and sent to Dr. Malkani a pro forma capitalization table that concealed the existence of the Wilson Loan.

**RESPONSE: Denied, except to admit that St. John provided input on the Waterfall (which was prepared by the Company's outside investment banker) and pro forma capitalization table.**

      c.    Wilson fraudulently concealed the existence of the Wilson Loan and its Nuclear Option from all Board members, investors, and lenders, and aided in the sale of fraudulent securities by concealing the Nuclear Option from Dr. Gupta during the period in which Dr. Gupta purchased the three (3) Units and paid TruthMD's loan in exchange for another Unit. Wilson further aided in the sale through statements Dr. Malkani on and around April 28, 2020, whom he pressured to continue to loan money to TruthMD. Wilson further stood to benefit as one of the four insiders who would receive valuable rights and/or bonuses in the event of an acquisition. In addition to his participation in the scheme to defraud, Wilson's mere silence on the Wilson Loan terms including the Nuclear Option constituted fraud because as Manager he owed a fiduciary duty to disclose the Wilson Loan terms to Red Dragon, who was a minority member at the time that Dr. Gupta was contemplating an additional purchase of three (3) units through Red Dragon.

**RESPONSE: Denied, except to admit that Wilson had communications with Malkani on or about the date stated and was one of the individuals that was included in the Earnout Payment Sharing that was approved by the Company's Board.**

      d.    Rosen concealed the existence of the Wilson Loan and its Nuclear Option from all lenders, investors, and members even as he pressured them to invest or loan money to TruthMD. Specifically, Rosen aided in the sale of fraudulent securities through

statements to Dr. Malkani on and around April 27, 2020, which concealed the existence of the Nuclear Option, which he knew about, while pressuring Dr. Malkani to loan money to TruthMD. Rosen further stood to benefit as one of the four insiders who would receive valuable rights and/or bonuses in the event of an acquisition. In addition to his participation in the scheme to defraud, Rosen's mere silence on the Wilson Loan terms including the Nuclear Option constituted fraud because as Manager he owed a fiduciary duty to disclose the Wilson Loan terms to Red Dragon, who was a minority member at the time that Dr. Gupta was contemplating an additional purchase of three (3) units through Red Dragon.

**RESPONSE: Denied, except to admit that Rosen had communications with Malkani on or about the date stated and was one of the individuals that was included in the Earnout Payment Sharing that was approved by the Company's Board.**

101.    Red Dragon would not have purchased units in 2020 or redeemed loans on behalf of TruthMD but for the omission of the Wilson Loan and its Nuclear Option from communications by all Defendants, and Defendants Cunningham and St. John's omission of material fact regarding the source of the three (3) units.

**RESPONSE: Defendants lack information sufficient to admit or deny the allegations of this paragraph and therefore deny the same and demand strict proof thereof at the time of trial.**

### COUNT IV
### (Common Law Fraud)
### (Against All Defendants)

102.    Plaintiff incorporates Paragraphs Nos. 1-82 as if stated fully herein.

**RESPONSE: Defendants incorporate the preceding paragraphs of their Answer as though more fully set forth at length herein.**

103.     The elements of common law fraud are (1) a false statement of material fact, (2) the representor's knowledge that the statement is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation. Fraud also includes the intentional omission of a material fact.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

104.     In connection with the sale of the Class F Units to Red Dragon, Defendants, through TruthMD, knowingly and intentionally participated or aided TruthMD in obtaining money or property from Plaintiff, lenders, and members by means of untrue statements of material fact and omission of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

**RESPONSE: Denied.**

a.     Cunningham circulated multiple documents and communications to Plaintiff and the Company's members, including a February 21, 2019, balance sheet and a May 4, 2021, "Investor Update," all of which concealed the existence of the Wilson Loan. Further, Cunningham concealed the existence of the Nuclear Option during communications with Red Dragon on August 25, 2020, and September 12, 2020. During those same communications, Cunningham affirmatively assured Dr. Gupta that the units were existing units.

**RESPONSE: Defendants admit that Cunningham circulated various documents, including a balance sheet and Investor update and had communications with Red Dragon. Defendants deny that these communications "concealed" the Nuclear Option from Plaintiff**

and shareholders. **Defendants deny the allegations of the third sentence of this Paragraph. Defendants admit that Cunningham was one of the individuals that was included in the Earnout Payment Sharing that was approved by the Company's Board. All remaining allegations are denied.**

      b.     St. John concealed from multiple investors and shareholders the existence of the Wilson Loan and its Nuclear Option. For example, St. John modified and sent to Dr. Gupta the Waterfall, which contained multiple misrepresentations designed to conceal the Nuclear Option, despite his knowledge of the same. During the September 12, 2020, meeting with Dr. Gupta, St. John neither disclosed the existence of the Wilson Loan nor corrected Cunningham's representations as to the origin of the three (3) units. Additionally, on April 15, 2019, St. John prepared and sent to Dr. Malkani a pro forma capitalization table that concealed the existence of the Wilson Loan.

**RESPONSE: Denied, except to admit that St. John provided input on the Waterfall (which was prepared by the Company's outside investment bankers) and pro forma capitalization table.**

      c.     Wilson fraudulently concealed the existence of the Wilson Loan and its Nuclear Option from all Board members, investors, and lenders, including Dr. Gupta during the period in which Dr. Gupta purchased the three (3) Units and paid TruthMD's loan in exchange for another Unit, and in statements to Dr. Malkani on and around April 28, 2020, whom he pressured to continue to loan money to TruthMD. Wilson further stood to benefit as one of the four insiders who would receive valuable rights and/or bonuses in the event of an acquisition. In addition to his participation in the scheme to defraud, Wilson's mere silence on the Wilson Loan terms including the Nuclear Option constituted

fraud because as Manager he owed a fiduciary duty to disclose the Wilson Loan terms to Red Dragon, who was a minority member at the time that Dr. Gupta was contemplating an additional purchase of three (3) units through Red Dragon.

**Answer: Denied, except to admit that Wilson had communications with Malkani on or about the date stated and was one of the individuals that was included in the Earnout Payment Sharing that was approved by the Company's Board.**

        d.      Rosen concealed the existence of the Wilson Loan and its Nuclear Option from all lenders, investors, and shareholders despite his knowledge even as he pressured them to invest or loan money to TruthMD. Specifically, Rosen failed to inform Dr. Gupta about the Nuclear Option during the period in which Dr. Gupta purchased the three (3) Units and paid TruthMD's loan in exchange for another Unit. Rosen's further statements to Dr. Malkani on and around April 27, 2020, concealed the existence of the Nuclear Option, which he knew about, while pressuring Dr. Malkani to loan money to TruthMD. Rosen further stood to benefit as one of the four insiders who would receive valuable rights and/or bonuses in the event of an acquisition. In addition to his participation in the scheme to defraud, Rosen's mere silence on the Wilson Loan terms including the Nuclear Option constituted fraud because as Manager he owed a fiduciary duty to disclose the Wilson Loan terms to Red Dragon, who was a minority member at the time that Dr. Gupta was contemplating an additional purchase of three (3) units through Red Dragon.

**RESPONSE: Denied, except to admit that Rosen had communications with Malkani on or about the date stated and was one of the individuals that was included in the Earnout Payment Sharing that was approved by the Company's Board.**

105.     The false statements of fact were made with the purpose of inducing Red Dragon to purchase additional membership units and with the knowledge that they were false and/or to induce Red Dragon to redeem loans on behalf of TruthMD.

**RESPONSE: Denied.**

106.     Red Dragon purchased additional membership units in reliance on Defendants' false statements and redeemed loans on behalf of TruthMD in reliance on Defendants' false statements.

**RESPONSE: Denied.**

107.     The false statements damaged Plaintiff by causing it to invest and/or loan money to a Company with the Nuclear Option in a way that disguised the true value of the units and diluted existing unitholders, including Plaintiff.

**RESPONSE: Denied.**

**COUNT V**
**(Common Law Breach of Fiduciary Duty)**
**(Against All Defendants)**

108.     Plaintiff incorporates Paragraphs Nos. 1-82 as if stated fully herein.

**RESPONSE: Defendants incorporate the preceding paragraphs of their Answer as though more fully set forth at length herein.**

109.     The elements of a cause of action for breach of fiduciary duty are (1) the existence of a duty, (2) breach of that duty, and (3) damages flowing from the breach.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

110.    Managers of a Delaware limited liability company owe traditional fiduciary duties of loyalty and care to the members of the LLC, unless the parties expressly modify or eliminate those duties in the operating agreement.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

111.    As an officer of TruthMD, Cunningham owed a fiduciary duty to Plaintiff. Plaintiff reposed its trust and confidence in Cunningham, who undertook such trust and assumed a duty to advise, counsel, and protect Plaintiff and shareholders. Cunningham knowingly and intentionally breached her fiduciary duty to Red Dragon by making material misrepresentations and omissions in connection with Red Dragon's purchase of the Class-F membership units in September 2020.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.  Defendants deny that Cunningham breached any fiduciary duty owed to Red Dragon.**

112.    As an officer of TruthMD, St. John owed a fiduciary duty to Plaintiff. Plaintiff reposed its trust and confidence in St. John, who undertook such trust and assumed a duty to advise, counsel, and protect Plaintiff and shareholders. St. John knowingly and intentionally breached his fiduciary duty to Red Dragon by making material misrepresentations and omissions in connection with Red Dragon's purchase of the Class-F membership units in September 2020.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required,**

those allegations are denied to the extent inconsistent with the applicable law.  Defendants deny that St. John breached any fiduciary duty owed to Red Dragon.

113.    As an officer of TruthMD, Cunningham, Rosen owed a fiduciary duty to Plaintiff. Plaintiff reposed its trust and confidence in Rosen, who undertook such trust and assumed a duty to advise, counsel, and protect Plaintiff and shareholders. Rosen knowingly and intentionally breached his fiduciary duty to Red Dragon by making material misrepresentations and omissions in connection with Red Dragon's purchase of the Class-F membership units in September 2020.

RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.  Defendants deny that Rosen breached any fiduciary duty owed to Red Dragon.

114.    As an officer of TruthMD, Wilson owed a fiduciary duty to Plaintiff. Plaintiff reposed its trust and confidence in Watson, who undertook such trust and assumed a duty to advise, counsel, and protect Plaintiff and shareholders. Wilson knowingly and intentionally breached his fiduciary duty to Red Dragon by making material misrepresentations and omissions in connection with Red Dragon's purchase of the Class-F membership units in September 2020.

RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.  Defendants deny that Wilson breached any fiduciary duty owed to Red Dragon.

115.    The conduct of Cunningham, St. John, and Wilson caused Plaintiff to incur damages.  Whether Wilson's fiduciary duties were waived under the Operating Agreement is

currently before the Delaware Court of Chancery, which has ruled that the determination hinges on a factual dispute.

**RESPONSE: Denied.**

## COUNT VI
### (Common Law Conspiracy)
### (Against All Defendants)

116.     Plaintiff incorporates Paragraphs Nos. 1-82, Nos. 97-101, and Nos. 102-107 as if stated fully herein.

**RESPONSE: Defendants incorporate the referenced paragraphs of their Answer as though more fully set forth at length herein.**

117.     The elements of a cause of action for conspiracy are: (1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) an overt act to further the conspiracy; and (4) damage to the plaintiff as a result of the acts done under the conspiracy.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

118.     Here, Cunningham (1) agreed with the other Defendants (2) to defraud investors by concealing the Wilson Loan, (3) committing an overt act by circulating multiple financial documents to investors which did not reveal the Wilson Loan, thereby (4) damaging Red Dragon by inducing Red Dragon to purchase units it otherwise would not have purchased.

**RESPONSE: Denied.**

119.     Similarly, Wilson (1) agreed with the other Defendants (2) to defraud investors by concealing the Wilson Loan, (3) committing an overt act by urging Dr. Malkani to loan money to

TruthMD while concealing the existence of his own loan to TruthMD, thereby (4) damaging Red Dragon by inducing Red Dragon to purchase units it otherwise would not have purchased.

**RESPONSE: Denied.**

120.    Similarly, St. John (1) agreed with the other Defendants (2) to defraud investors by concealing the Wilson Loan (3) committing an overt act consisting of circulating multiple financial documents to investors which did not reveal the Wilson Loan, thereby (4) damaging Red Dragon by inducing Red Dragon to purchase units it otherwise would not have purchased.

**RESPONSE: Denied.**

121.    Similarly, Rosen (1) agreed with the other Defendants (2) to defraud investors by concealing the Wilson Loan, (3) committing an overt act by omitting the existence of the Wilson

Loan when he spoke to investors to encourage investment thereby (4) damaging Red Dragon by inducing Red Dragon to purchase units it otherwise would not have purchased.

**RESPONSE: Denied.**

## COUNT VII
### (Common Law Aiding and Abetting)
### (Against all Defendants)

122.    Plaintiff incorporates Paragraph Nos. 1-89 and Nos. 97-107as if stated fully herein.

**RESPONSE: Defendants incorporate the referenced paragraphs of their Answer as though more fully set forth at length herein.**

123.    The elements of a cause of action for aiding and abetting are: (1) actual knowledge of the fraud; and (2) substantial assistance.

**RESPONSE: The allegations of this paragraph are conclusions of law to which no responsive pleading is required.  To the extent a responsive pleading is deemed required, those allegations are denied to the extent inconsistent with the applicable law.**

124.    Cunningham (1) actually knew that the Nuclear Option was being concealed from investors and (2) substantially assisted the fraud by circulating documents which continued to conceal its existence, including a February 21, 2019, balance sheet and a May 4, 2021, "Investor Update," all of which concealed the existence of the Wilson Loan.

**RESPONSE: Denied.**

125.    St. John (1) actually knew that the Nuclear Option was being concealed from investors and (2) substantially assisted the fraud by creating and circulating documents which continued to conceal its existence, including the September 11, 2020, Waterfall and the April 15, 2019, pro forma capitalization table which both concealed the existence of the Wilson Loan.

**RESPONSE: Denied.**

126.    Wilson (1) actually knew that the Nuclear Option was being concealed from investors, including Dr. Gupta and (2) substantially assisted the fraud by not correcting what was represented to Dr. Gupta and through statements to Dr. Malkani on and around April 28, 2020, who he pressured to continue to loan money to TruthMD.

**RESPONSE: Denied.**

127.    Rosen (1) actually knew that the Nuclear Option was being concealed from investors, including Dr. Gupta and took no steps to correct the misrepresentations and (2) substantially assisted the fraud through statements to Dr. Malkani on and around April 27, 2020, which did not reveal the existence of the Nuclear Option while pressuring Dr. Malkani to loan money to TruthMD.

**RESPONSE: Denied.**

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Red Dragon prays for an order:

a.     Declaring that the TruthMD Defendants are jointly and severally liable for defrauding Red Dragon;

b.     Declaring that the TruthMD Defendants conspired to defraud Red Dragon;

c.     Declaring that the TruthMD Defendants aided and abetted TruthMD and one another in defrauding Red Dragon;

d.     Declaring that Cunningham, Wilson, and St. John breached their fiduciary duty to Red Dragon;

e.     Awarding Red Dragon rescission of the sale of the units;

f.     Awarding Red Dragon compensatory damages in an amount to be determined at trial;

g.     Awarding Red Dragon prejudgment interest, costs, and post-judgment interest; and

h.     Awarding Red Dragon any and all further relief deemed just, equitable, and proper.

**RESPONSE: Defendants deny that Red Dragon suffered damages or is entitled to relief as stated.**

## Jury Trial Demanded

Plaintiff Red Dragon Partners, LLC, hereby demands trial by jury for all issues so triable.

**RESPONSE: Defendants deny that Plaintiff is entitled to a jury trial as a result of the terms of the Subscription Agreements and other documents governing its relationship with Defendants.**

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

The Complaint is barred by the Statute of Limitations.

## THIRD AFFIRMATIVE DEFENSE

Any allegations that Red Dragon relied upon representations not contained within the Subscription Agreements executed by Red Dragon or the Limited Liability Company Agreements to which Red Dragon is a Party are void pursuant to the terms of those agreements.

## FOURTH AFFIRMATIVE DEFENSE

Any issuance of the Wilson Loan with its preliminary conversion terms was an *ultra vires* act as those terms were not approved by the Company's Board.

## FIFTH AFFIRMATIVE DEFENSE

The allegations of Red Dragon's Complaint, if proven, did not cause any damages.

## SIXTH AFFIRMATIVE DEFENSE

Any alleged misstatements or omissions described in the Complaint were not material.

## SEVENTH AFFIRMATIVE DEFENSE

Red Dragon has not tendered any Units back to the Company so as to maintain a cause of action for rescission.

## EIGHTH AFFIRMATIVE DEFENSE

Red Dragon's Breach of Fiduciary Duty cause of action is limited by the 18 Del.C. § 18-1110(c) provision of the Company's organizing documents.

## NINTH AFFIRMATIVE DEFENSE

To the extent that any material misstatement or omission is proven, Defendants lacked the intent required to impose liability upon them.

## TENTH AFFIRMATIVE DEFENSE

Red Dragon, a sophisticated investor, based on the Subscription Agreements and other relevant paperwork reviewed and signed by Red Dragon and its prior business dealings and investments with the Company, including the purchase of new and existing Units, knew or should have known that the Units complained of in the Complaint were newly issued. These Subscription Agreements and documents are attached as Exhibits 1-3.

### ELEVENTH AFFIRMATIVE DEFENSE

Red Dragon, a sophisticated investor, received Subscription Agreements indicating that it could ask questions concerning the Company, its business activities, and the terms and conditions of the offering. Red Dragon further warranted that it had asked all questions and requested all information it deemed necessary to purchase units in the Company and received satisfactory answers. Red Dragon further warranted that it understood that it bore the risks associated with its investment. Additionally, Red Dragon knew or should have known that the Company did not disclose the convertible features of its loans and did not inquire regarding the convertible features of the Company's loans. Red Dragon therefore knowingly assumed the risk of the allegations outlined in the Complaint.

### TWELFTH AFFIRMATIVE DEFENSE

The liability of the individual defendants, if any, is limited by Section 10(i) of the Company's organizing documents.

### THIRTEENTH AFFIRMATIVE DEFENSE

Section 3.5 of the Company's organizing documents preclude Red Dragon from withdrawing or returning capital.

WHEREFORE, Defendants, TruthMD, LLC, Gemma Cunningham, Morgan St. John, Gary L. Wilson, and Dr. Charles D. Rosen demand dismissal of Plaintiff's Complaint, judgment in their favor and costs, fees, and whatever such relief as this Court deems just and proper.

Dated: May 1, 2025                    **GORDON REES**
                                      **SCULLY MANSUKHANI LLP**

                                      /s/ Michael C. Heyden, Jr.
                                      Michael C. Heyden, Jr. (#5616)
                                      Joseph E. Brenner (#6643)
                                      824 N. Market Street, Suite 220
                                      Wilmington, DE 19801
                                      Telephone: (302) 992-8954
                                      Facsimile: (302) 724-6444
                                      mheyden@grsm.com

                                      *Attorneys for Defendants*

47

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned does hereby certify that, on May 1, 2025, a copy of the foregoing

document was served on all counsel of record, via CM/ECF.

<u>/s/ Michael C. Heyden, Jr.</u>
Michael C. Heyden, Jr. (#5616)